William H. DUNHAM, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

Lenore M. WINNER, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

Nos. 14243, 79–126.

District of Columbia Court of Appeals.

Submitted Oct. 22, 1980.

Decided Jan. 29, 1982.

William H. Dunham, pro se.

Fred C. Zacharias, Georgetown Legal Intern Program, Washington, D.. C., was on the briefs submitted in behalf of appellant Winner. William W. Greenhalgh, Washington, D. C., appointed by the court, also entered an appearance in behalf of appellant Winner.

Judith W. Rogers, Corp. Counsel, Richard W. Barton, Deputy Corp. Counsel, and Leo N. Gorman, Asst. Corp. Counsel, Washington, D. C., were on the brief submitted in behalf of appellee.

Before NEWMAN, Chief Judge, HARRIS, Associate Judge, and GALLAGHER,* Associate Judge, Retired. .

GALLAGHER, Associate Judge, Retired:

On June 7, 1977, informations were filed against appellants William H. Dunham and Lenore M. Winner, charging them each with three counts of operating a proprietary school in the District of Columbia without a license and three counts of acting as agents for a proprietary school without an agent's permit. Winner was arrested the following day, but Dunham was not taken into custody until August 4, 1977. While Winner was at the police station following her arrest, her purse was searched without a warrant and numerous pieces of documentary evidence recovered. On the basis of this evidence, additional informations were issued against appellants, charging them each with three more counts of operating a proprietary school without a license and three more of acting as an unlicensed agent of a proprietary school. After a nonjury trial, the appellants were found guilty; Winner of four counts of operating an unlicensed proprietary school and two of acting as an unlicensed agent therefor, and Dunham of three counts of operating an unlicensed proprietary school.

Appellants raise four issues, only three of which merit full discussion.[1] First, they both contend that the informations

---

* Judge Gallagher was an Associate Judge of the court at the time of submission. His status changed to Associate Judge, Retired, on February 27, 1981.

1. Appellants' remaining contention—that the court admitted irrelevant evidence—clearly lacks merit. The assertedly immaterial evidence, *both testimonial and documentary*, related to appellants' connection with the Virginia Business Institute, a nominally defunct enterprise which the government contends was still operating through appellants' putative "tutoring service" in the District. See discussion *infra.* We note, as did the trial judge, that the government's theory of the case is compatible with the applicable regulations' definition of "proprietary school," *see* 5GG DCRR § 1.2(e) (quoted *infra*), and hold that the challenged evidence was unquestionably material to the charges. *See generally* McCormick on Evidence ch. 16 (2d ed. 1972).

filed against them were multiplicitous. Second, appellant Winner argues that the search of her purse was invalid because not within any of the exceptions to the warrant requirement and that, accordingly, the evidence obtained as a result of the search was inadmissible. Finally, both appellants contend that, notwithstanding the improperly admitted evidence, the proof offered was insufficient to sustain the judgment of the trial court. Finding each of these contentions to be without merit, we affirm.

I

It was uncontroverted in the trial court that appellants operated a bonded and duly licensed incorporated school in Alexandria, Virginia, known as the Virginia Business Institute. The school's bond was later cancelled and the school was forced to cease its operations. Shortly thereafter, appellant Winner moved her offices to 1411 K Street, N.W. in the District of Columbia, and commenced an enterprise there known as the Washington Tutoring Center.

It is the government's theory that "the Washington Tutoring Center, at least in part, was in reality the Virginia Business Institute operating in a different location [the District of Columbia] under a different name." Title 5GG, District of Columbia Rules and Regulations (DCRR) (1971) provides that all proprietary schools or branches of proprietary schools operating in the District must be licensed, and that all "agents" of such schools must obtain agents' permits.[2]

2. The relevant sections of 5GG DCRR are as follows:

Sec. 1.1 Purpose and Scope.

(a) Purpose. The purpose of these regulations is to establish licensing requirements for proprietary schools in the District, and for all agents acting on behalf of proprietary schools in soliciting students. These regulations are designed to protect prospective and enrolled students from unscrupulous and financially irresponsible proprietary schools and to assure, to the extent possible, that the promotional information provided to the public by proprietary schools is accurate and honest.

(b) Scope. These regulations shall apply to all proprietary schools located in the District, and to all agents operating in the District.

Sec. 1.2 Definitions.

As used in these regulations, the following terms shall have the meanings described below:

(a) Agent: A person employed by a proprietary school, whether such school is located within or outside the District, who solicits in the District students or enrollees for such school by any means and in any place.

* * * * * *

(e) Proprietary School: A privately-owned school in the District, or any branch, extension, or facility in the District of a proprietary school located elsewhere, which offers for a consideration resident or correspondence courses or training or instruction for the purpose of enabling an individual to improve his appearance, social aptitude, social skills, intellectual aptitude, personality, or other personal attributes or which purports to prepare or qualify individuals for employment in any occupation or trade or in work requiring mechanical, technical, artistic, or clerical skills; except that such term shall not include:

(1) Residential Institutions providing exclusively elementary (including kindergarten) and secondary education;

(2) Degree-granting institutions of higher learning licensed by the Board of Higher Education or chartered by an Act of Congress;

(3) Schools conducted by any person solely for the training of the employees of the person, and for which no fee is charged; or

(4) Any course of instruction offered by the District or Federal Government or any instrumentality thereof.

(f)(1) Student: Full-time and part-time enrollees in a proprietary school.

* * * * * *

Sec. 2.1 License Required.

After the effective date of these regulations, no person shall operate a proprietary school in the District without having first obtained a license from the [Mayor]. Such license shall be assigned or transferred only in accordance with the provisions of the Act approved July 1, 1932 (D.C.Code, sec. 47–2301, et seq.)

* * * * * *

Sec. 2.6 Authorized Agents.

(a) After the effective date of these regulations, no person shall act as an agent for a proprietary school located in the District or elsewhere, without having first obtained an agent's permit from the [Mayor].

* * * * * *

Sec. 3.3 Penalties.

Any person violating any provision of these regulations shall upon conviction be fined not more than $300 or imprisoned for not more than 90 days.

Appellants contend, *inter alia*, that the Washington Tutoring Center had no connection with the Virginia Business Institute and that the former was designed and operated as nothing but a tutoring service. In interpretive guidelines developed by the Office of License and Permits, tutoring services were specifically exempted from the licensing requirements of Title 5GG. The guidelines read, in full, as follows:

### PROPRIETARY SCHOOL EXEMPTIONS ALLOWED:

A school must be licensed unless exempted by regulation. It has been determined that persons teaching or tutoring are not a proprietary school under the intent of the regulation if such persons meet ALL six of the following criteria:

1. The student body is limited to no more than three (3) students (in the case of music instruction one (1) student) on the premises at any one time;

2. No contractual agreements or instruments of security are executed;

3. No money is exchanged until after completion of training and/or instructions (pay as you go);

4. Courses and/or training are not advertised via broadcast media, billboards, and magazines; advertisements are restricted to handout cards, etc., no larger than 3″ × 5″;

5. Correspondence courses are not offered; and

6. No sales agents are employed. The regulations are intended to protect students from unscrupulous or financially irresponsible proprietary schools. Students are safeguarded from risk when all of the above criteria are operating.

Persons enquiring into licensing requirements were customarily informed that a license was not required if an operation met all six of the above criteria. There was evidence that appellant Winner in fact visited the Office of Licenses and Permits and was orally advised of these requirements for a licensing exemption.

## II

Two informations of six counts each were filed against each of the appellants. A pair of counts—one charge of operating a proprietary school without a license and one of acting as an agent therefor without a permit—was filed with respect to each of four individuals alleged to be students of the Washington Tutoring Center; in addition, a single count of operating an unlicensed school was filed with respect to another individual, and one count of operating an unlicensed school and two counts of acting as an agent were issued with respect to a sixth student. By pretrial motion, and now again on appeal, appellants contend that the informations filed against them were doubly multiplicitous. First, appellant Winner argues, the informations impermissibly sought to punish appellants twice—as both principals and agents—for the single offense of operating a proprietary school without a license.[3] Second, appellants argue, the informations were multiplicitous in that they charged appellants in six separately punishable counts with the single offense of operating an unlicensed proprietary school. We reject both arguments.

The rule that an indictment or information may not be multiplicitous, that is, charge a single offense in several counts, is a corollary of the Fifth Amendment double jeopardy clause, which "protects against . . . multiple punishments for the same offense." *Ball v. United States*, D.C.App., 429 A.2d 1353, 1357 (1981), *quoting North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) (footnotes omitted). *See generally* 1 C. Wright, Federal Practice & Procedure: *Criminal* § 142 (1969). Whether the multiplicity is alleged to result from charges of violating several separate statutory (or, in this case, regulatory) proscriptions by the commitment of a single act (appellants' first argument), or from the expansion of that act into several acts separately punishable un-

---

**3.** Because appellant Dunham was not convicted of any of the counts charging activity as an agent, he does not raise this first multiplicity argument on appeal.

der a single statutory (or regulatory) provision (appellants' second argument), the decisive consideration is the intent of the legislature. In the former case, the question is whether the legislature intended, by enacting separate statutes or regulations applicable to the same act, to punish that act more than once; and the long-recognized rule for deciding this question is that the violated statutes or regulations define separate offenses if "each provision requires proof of a fact which the other does not." *Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 1139, 67 L.Ed.2d 275 (1981), *quoting Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). *See also Whalen v. United States,* 445 U.S. 684, 692, 100 S.Ct. 1432, 1438, 63 L.Ed.2d 715 (1980); *Ball, supra* at 1358. In the latter situation, where it is clear that only one statutory or regulatory proscription has been violated but unclear how often, the question is what the legislature has made "the allowable unit of prosecution." *Bell v. United States,* 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955), *quoting United States v. Universal C.I.T. Credit Corp.,* 344 U.S. 218, 221, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952).

■ Turning to appellant Winner's first argument, we note that appellants were each charged with violations of two distinct regulations, 5GG DCRR §§ 2.1 and 2.6(a), which prohibit operation of an unlicensed proprietary school and acting as an agent for a proprietary school without an agent's permit, respectively.[4] Consonant with their express dual purpose of protecting students from "unscrupulous and financially irresponsible proprietary schools" and insuring that the promotion of even financially sound and well-run schools be "accurate and honest," *see id.* § 1.1(a), the regulations require both that schools be licensed and their promotional agents obtain permits. *See id.* §§ 2.1, 2.6(a). The gravamen of acting as an agent is solicitation, *see id.* § 1.2(a). Operating a proprietary school involves actually contracting for provision of training or

instruction, *see id.* (e). Clearly, under *Blockburger, supra,* the offenses are distinct, and we may accordingly infer that the regulations are intended to punish separately the operation of a proprietary school without a license and solicitation for a proprietary school without an agent's permit.

As support for their second argument, appellants point out, correctly, that the regulations, on their face, prohibit the unlicensed operation of a "school." Appellants contend, however, that a " 'school,' . . . by definition must include more than one student," and that contacts or relationships with individual students are relevant only insofar as they establish a "course of conduct" fairly describable as the "operation of a school." We can agree with neither of these propositions.

In our view, the question of what the legislature intended to be "the allowable unit of prosecution," *United States v. Universal C.I.T. Credit Corp., supra* at 221, 73 S.Ct. at 229, for the offense of operating a proprietary school without a license is controlled by the decision in *Baldwin v. District of Columbia,* D.C.Mun.App., 183 A.2d 566 (1962). In *Baldwin,* the court rejected the claim that the practice of podiatry without a license was a continuing offense, and held that the accused could be prosecuted for each instance of treatment. *Id.* at 568. The court noted that the manifest purpose of the podiatry licensing statute, D.C.Code 1973, §§ 2–701, –719, was "not merely to attach a badge to professional careers, but to protect the public," and accordingly concluded that "each act of treatment constitutes a fresh menace, each repetition a new threat of the abuse which the statute was designed to prevent." *Id.*

We take a similar view of Title 5GG. The regulations' express purpose is not to raise revenue through license fees, but to "protect prospective and enrolled students from unscrupulous and financially irresponsible proprietary schools" and misleading

4. We note that in his brief on appeal, counsel for Winner states that Winner was charged "on three counts of operating a proprietary school without a license and three counts of *acting as* *agent for a proprietary school operating without a license*" (emphasis added). The italicized phrase does not accurately describe the offense contemplated by 5GG DCRR § 2.6(a).

solicitation for such schools. 5GG DCRR § 1.1(a). *See generally* Annot. 93 A.L.R.2d 90 (1964). That purpose is best served if prosecution for "operation of a school" is permitted with respect to each student enrolled, regardless of whether training or instruction has actually been received. The vice is not the bare existence of a school as a facility[5] or (as we perhaps commonly use the term) a group of students,[6] but the active "*operation*" of that school, not in providing instruction or training, but in doing so for a prepaid consideration. Thus, the appropriate "unit of prosecution" is not each day of training or instruction given, or each lesson itself, but each instance of enrolling a student in exchange for a fee.

■ Accordingly, we hold that it was not improper for the government to charge appellants with separate counts of operating a proprietary school without a license with respect to each student enrolled, as well as separate counts of acting as agents for a proprietary school without agents' permits with respect to each student solicited.

### III

■ Appellant Winner's second argument is that it was error for the trial judge to have denied her motion to suppress certain evidence seized from her purse.[7] Upon her arrest pursuant to a warrant at the offices of the WTC, Winner reached for her purse as if to take it with her to the station; one of the arresting officers took possession of the purse, searched it for weaponry, and finding none, returned it to Winner. Some three hours later, while Winner was being processed at police headquarters, the detective investigating the WTC case thoroughly

searched her purse—which was some four to five feet from Winner but apparently within her reach—and recovered the challenged documentary evidence. We agree with the trial judge that the search was justified as a valid search incident to arrest.

In *United States v. Simmons*, D.C.App., 302 A.2d 728 (1973) this court rejected the view—then recently advanced by the D.C. Circuit Court in *United States v. Robinson*, 153 U.S.App.D.C. 114, 471 F.2d 1082 (1972) (en banc)—that a search incident to arrest must be confined to a frisk for weaponry where the offense charged necessarily involves no evidence or fruits. Later, the Supreme Court reversed the Circuit Court's opinion in *Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), and made clear that the Fourth Amendment permits the police to search fully the person of an arrestee, stating:

> A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment. [*Id.* at 235, 94 S.Ct. at 476.]

Subsequently, in *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), the Court made plain that *Robinson's* search-incident-to-arrest rule extended to stationhouse searches of

---

**5.** Since a "school" offering only a correspondence course would run afoul of the regulations if not licensed, a physical facility is not even a requisite. *See* 5GG DCRR § 1.2(e).

**6.** The regulations in fact define "proprietary school" as a school which offers training or instruction "for the purpose of enabling *an individual* to improve his ... personal attributes." *Id.* (Emphasis added.) This suggests that an enrollment of one is sufficient to trigger the regulations. Although the interpretive guidelines issued by the Office of Licenses and Permits (quoted *supra*) make clear that infor-

mal tutoring services are not within the purview of the regulations, they also suggest that the teaching of only a single student will be subject to the regulations if, for example, the "tutor" demands payment in advance of instruction.

**7.** The evidence consisted of various receipts, resumes and an enrollment agreement. On the basis of this evidence, additional informations were filed against appellants with respect to three alleged students.

"both the person and the property in his immediate possession." *United States v. Edwards, supra* at 803, 94 S.Ct. at 1237. After citing *Robinson*, the Court stated:

It is also plain that searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention. If need be, *Abel v. United States,* 362 U.S. 217 [80 S.Ct. 683, 4 L.Ed.2d 668] (1960), settled this question. There the defendant was arrested at his hotel, but the belongings taken with him to the place of detention were searched there.

In sustaining the search, the Court noted that a valid search of the property could have been made at the place of arrest and perceived little difference

"when the accused decides to take the property with him, for the search of it to occur instead at the first place of detention when the accused arrives there, especially as the search of property carried by an accused to the place of detention has additional justifications, similar to those which justify a search of the person of one who is arrested." *Id.* at 239, 94 S.Ct. at 478. [*United States v. Edwards,* 415 U.S. at 803, 94 S.Ct. at 1237.]

The Court held valid the jailhouse seizure and search of an arrestee's clothing the morning after his arrest and incarceration on the ground, *inter alia,* that "Edwards was no more imposed upon than he could have been at the time and place of the arrest or immediately upon arrival at the place of detention." *Id.* at 805, 94 S.Ct. at 1238.

In our view, the trial court's conclusion that *Robinson* and *Edwards* control the search in the instant case was eminently correct. It cannot seriously be doubted that when appellant Winner reached for her purse, the arresting officers had the constitutional authority to search it, not just for weapons, but also for evidence of the charged offenses. Under *Edwards,* it is inconsequential that the search for evidence was delayed until some three hours later at police headquarters, where it was conducted by a detective who, unlike the arresting officers, knew precisely what sort of evidence was material. Nor is it relevant that the detective's asserted reason for going through the purse was to "search[] . . . for weaponry in preparation for detention."[8] It is the fact of a valid arrest which furnishes the justification for a search incident thereto. *United States v. Robinson, supra,* 414 U.S. at 235, 94 S.Ct. at 476. The detective's "second look" at the contents of Winner's purse was unobjectionable, in part because of the reduction in her reasonable expectation of privacy occasioned by the arresting officer's first peremptory search of its contents. *United States v. Grill,* 484 F.2d 990, 991 (5th Cir. 1973), *cert. denied,* 416 U.S. 989, 94 S.Ct. 2396, 40 L.Ed.2d 767 (1974). *See generally* 2 W. LaFave, Search and Seizure § 5.3(b) (1978) & Supp.1981.

The Supreme Court's recent decision in *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), dispenses with appellant's contention that *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), invalidates the search here. In *Belton,* the Court held that under the facts there, a search of the arrestee's jacket was a valid one incident to the arrest.[9] The Court extended the reach of its decision to "containers" found in the passenger compartment of the car. It seems evident that, on this record, a search

---

**8.** *See Scott v. United States,* 436 U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978), stating:

[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.

*See also People v. Bullwinkle,* 105 Cal.App.3d 82, 90, 164 Cal.Rptr. 163, 168, *appeal dismissed,* 449 U.S. 988, 101 S.Ct. 522, 66 L.Ed.2d 285 (1980) (officer's subjective belief irrelevant to question of validity of search).

**9.** The jacket was located on the inside of the passenger compartment of the stopped car.

of the arrestee's handbag is necessarily confirmed by *Belton.*[10]

We hold the search of appellant Winner's purse was valid.

### IV

Appellant Winner was convicted of separate counts of operating an unlicensed proprietary school (5GG DCRR § 2.1) with respect to four individuals (George Tate, Sharon Fessel Chopin, Georgia Thrasyvoulou, and Richard Thomas) and two counts of acting as an agent for a proprietary school without an agent's permit with respect to two of those individuals (Chopin and Thrasyvoulou). Appellant Dunham was found guilty of three counts of operating an unlicensed proprietary school—one for each of the students save Thomas. Appellants' final argument is that the evidence was insufficient to sustain these convictions. We find no merit in this contention.

 In reviewing whether the government has met its burden of proof, we must view the evidence in the light most favorable to the prosecution. *Curley v. United States,* 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232, *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). This court may not overturn a conviction if the evidence presented at trial reasonably permits a finding of guilt beyond a reasonable doubt. *Byrd v. United States,* D.C.App., 388 A.2d 1225, 1229 (1978); *Wooten v. United States,* D.C.App., 343 A.2d 281, 282 (1975) (per curiam); *Curley v. United States, supra* at 392, 160 F.2d at 232. Reversal is appropriate only where there is no evidence upon which a reasonable mind could find guilt. *United States v. Lumpkin,* 145 U.S.App.D.C. 162, 168, 448 F.2d 1085, 1091 (1971); *see Crawford v. United States,* 126 U.S.App.D.C. 156, 158, 375 F.2d 332, 334 (1967).

The evidence, taken in the light most favorable to the government, established that George Tate paid Winner $30 (purportedly in exchange for a resume), and executed a written contract for on-site training as a welder with Virginia Home Builders, Inc. (a corporation controlled by Dunham), for which he received training coupons; that Sharon Fessel Chopin, a former student of the nominally defunct Virginia Business Institute (VBI), was telephoned by Winner and told she could use her prepaid VBI coupons at the Washington Tutoring Center (WTC), and subsequently did so, receiving bookkeeping instruction from Winner; that Georgia Thrasyvoulou, who had also paid tuition to VBI, was likewise contacted by Winner and received instruction at WTC; and that Richard Thomas had called VBI to inquire about surveying courses, only to be telephoned later by Winner, who invited him to WTC's K Street offices and took $10, the receipt for which read "payment of reservation for the surveying course." In addition, the detective who had investigated the WTC case testified that Winner had once admitted to him that she, appellant Dunham, and one Shields, were the "owners" of WTC, and that it was unlicensed.

 In our view, this evidence was sufficient to establish both the solicitations central to Winner's convictions for acts as an agent, as well as the complicity of both appellants in the execution of enrollment agreements in exchange for prepaid fees, which agreements are, individually, the "units of prosecution" for the operation of an unlicensed proprietary school. *See* discussion *supra.* Because the informations

10. After noting that "the search of [appellant's] shoulder purse was clearly within the scope of . . . a search [incident to arrest]," the Seventh Circuit recently stated:

> The human anatomy does not naturally contain external pockets, pouches, or other places in which personal objects can be conveniently carried. To remedy this anatomical deficiency clothing contains pockets. In addition, many individuals carry purses or shoulder bags to hold objects they wish to have with them. Containers such as these, while appended to the body, are so closely associated with the person that they are identified with and included within the concept of one's person. To hold differently would be to narrow the scope of a search of one's person to a point at which it would have little meaning. We decline to do so. [*United States v. Graham,* 638 F.2d 1111, 1114 (7th Cir. 1981).]

filed were permissible and the charges were established by evidence we find to be both competent and adequate as a matter of law, the convictions are

*Affirmed.*