**LaAquanetta ALSTON, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 84–1519.**

District of Columbia Court of Appeals.

Submitted Sept. 27, 1985.
Decided Nov. 26, 1986.

Enid Hinkes, Washington, D.C., appointed by this court, for appellant.

Joseph E. diGenova, U.S. Atty., with whom Michael W. Farrell, Thomas J. Tourish, Jr., and Lizabeth A. McKibben, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before FERREN, BELSON and STEADMAN, Associate Judges.

STEADMAN, Associate Judge:

Appellant was convicted in a bench trial of one count of shoplifting, in violation of D.C.Code § 22–3813 (1986 Supp.).[1] Appellant claims that the trial court erred in denying her motion to suppress the contents of her tote bag on the ground that the search was by a private citizen and therefore the Fourth Amendment did not apply. We conclude that the department store employee who searched her bag was, under the circumstances, subject to the Fourth Amendment, but that the search was nonetheless constitutional, since it was incident to a lawful arrest.[2] Accordingly, we affirm the conviction.

I.

Security officer[3] Deidri Mitchell, employed by Woodward & Lothrop (a large department store), testified that she received a radio call to go to the women's sportswear area to look into a possible shoplifting. Mitchell, in plainclothes, turned off her radio and entered the fitting room across from appellant. When appellant left, Mitchell followed her. Appellant was carrying a blue tote bag over her shoulder and under her arm. The tote bag was open to view, similar to a shopping bag; by the way it was made, it could not be closed. Mitchell was able to see inside the bag a pink, white, and baby blue item, later proved to be a skirt, with a Woodward & Lothrop tag attached to it.

When appellant headed for the store exit on 10th Street, Mitchell started calling on the radio for her supervisor, Special Police

1. That section provides in part:

(a) A person commits the offense of shoplifting if, with intent to appropriate without complete payment any personal property of another that is offered for sale or with intent to defraud the owner of the value of the property, that person:

(1) Knowingly conceals or takes possession of any such property.

2. The facts presented at the suppression hearing were virtually undisputed; there were no express findings of fact by the trial court. We must determine whether the court's denial of the motion to suppress is sustainable under any reasonable view of the evidence. *In re B.K.C.*, 413 A.2d 894, 901 (D.C.1980). It is well settled that an appellate court may affirm a decision for reasons other than those given by the trial court. *Purce v. United States*, 482 A.2d 772, 775 n. 6 (D.C.1984) (citing *Garrett v. Washington Air Compressor Co.*, 466 A.2d 462, 464 n. 5 (D.C. 1983)); *see also United States v. Gayden*, 492 A.2d 868, 872 (D.C.1985) (affirming suppression of confessions on grounds different from those of the trial court).

3. In this opinion, we refer to two types of security personnel:

1) *Special Police Officers* —These are persons commissioned by the Mayor, pursuant to D.C. Code § 4–114 (1981), to protect the private property of a corporation or individual. They are paid by the person whose property they protect and their authority is "strictly confined" to that place or property. 6A DCMR §§ 1100.1–.2 (1984). Under D.C.Code § 23–582(a) (1981), a Special Police Officer "shall have the same powers as a law enforcement officer to arrest without warrant for offenses committed within premises to which his jurisdiction extends, and may arrest outside the premises on fresh pursuit for offenses committed on the premises." Special Police Officers are required to wear "distinctive uniforms," unless the Chief of Police waives the requirement. 6A DCMR § 1109.1 (1984).

2) *Security Officers* —These are persons licensed by the Mayor to prevent, inter alia, the theft, misappropriation, or concealment of goods. 17 DCMR § 2100.1 (1983, amended 1986). They are required to carry an identification card whenever on duty stating that "the bearer is not a police officer and only has the powers of an ordinary citizen." *Id.* §§ 2111.-1–.2. Under D.C.Code § 23–582(b)(1)(A), (B) (1981) and § 23–581(a)(2) (1986 Supp.), a private citizen may arrest another if there is probable cause to believe that the person is committing either a felony or one of several offenses, including shoplifting, in her presence. Security Officers are required to wear uniforms "distinctly different from the uniform of the Metropolitan Police Department." 17 DCMR § 2112.1 (1983, amended 1985).

Officer (SPO) Brenda Lee, also employed by the store. By the time she contacted Lee, appellant had walked past several cash registers, out the door, and was headed toward the small park across the street in front of the Martin Luther King Library. Appellant did not pay for any items while Mitchell was watching her.

Mitchell spoke with Lee on her radio as she followed appellant out of the store. When appellant turned and saw Mitchell using the radio, she began to run toward the park. By this time, other SPO's had joined Mitchell and all ran after appellant. She fell a short distance into the park and hurt her knee, at which point two SPO's caught her.[4] The fall did not dislodge the bag from appellant's shoulder. Appellant was escorted back to the store's security office by the two SPO's, one of whom carried appellant's bag.[5] Mitchell explained that "[t]he two SPO's that arrested Miss Alston took her back to the security office because she was hurt at that time and was not able to walk. So they were doing the best they could by helping her. She was not cuffed on the way to the office."

At the security office appellant was "informed of her rights and searched." A search of her person was made[6] "for our safety and hers." After a photograph was taken of Mitchell holding the tote bag, Mitchell searched the bag and discovered $429.83 worth of women's clothing, including the skirt Mitchell had previously observed. At least three SPO's were present in the office when Mitchell searched the bag, including her supervisor, Lee; apparently appellant was also present or nearby. At the suppression hearing, the government asserted that the search of the bag without a warrant was justified on three grounds: first, that it was incident to a

lawful arrest; second, that the Fourth Amendment did not apply to the store employee; and third, that it was a permitted inventory search. The trial judge accepted the government's argument that the security officer who searched the bag, Mitchell, was a private citizen to whom the Fourth Amendment did not apply, citing *United States v. Lima*, 424 A.2d 113 (D.C. 1980). He indicated he did not agree with the other two arguments.

## II.

At the outset we note that appellant does not contest the trial court's finding of probable cause to arrest; rather, she challenges the search as a violation of the Fourth Amendment. It is well established that,

[a]lthough a private individual may act unlawfully and violate the privacy of another, no constitutional violation has occurred absent government involvement in the intrusion.

*United States v. Lima, supra*, 424 A.2d at 117. Thus, we must first determine whether there was sufficient "governmental involvement" in the search to bring into play the constraints of the Fourth Amendment.

We start with the proposition that *Lima* drew a clear distinction between security officers, such as Mitchell, and SPO's, such as her supervisor Lee. It held that a privately employed security officer with the same arrest powers as an ordinary citizen is not vested with any particular state authority even though licensed by the state. *Id.* at 119–20. Their actions, thus, are those of a private individual and not those of an agent or instrumentality of the state. The court distinguished a licensed security officer[7] from a special police officer who

---

4. Mitchell testified that the two SPO's "cuffed her and helped her up."

5. The SPO carrying the bag was Mitchell's supervisor, Lee.

6. The record does not indicate who conducted the body search.

7. The store employee in *Lima* was not even licensed as a security officer, although apparently required to be so. For present purposes, we assume, as did the *Lima* court, that the proper licensing *vel non* of a private security officer does not change her Fourth Amendment status.

has the same arrest powers within his or her jurisdiction as a regular police officer:

> [W]here the security guard has powers akin to [those] of a regular police officer and is appointed by a governmental official, even though employed by a private company, sufficient trappings of state authority have been found to trigger Fourth Amendment restriction. Such is the case with a special police officer, commissioned in the District of Columbia under D.C. Code 1973 § 4-115.[8]

*Id.* at 118 (footnote omitted).[9]

Therefore, the action of the security officer in *Lima*—viewing the defendant through a louvered dressing room door—simply was not affected by Fourth Amendment considerations. The court noted an exception, however, where the circumstances of a case dictate that a private party " 'must be regarded as having acted as an "instrument" or agent of the state.' " 424 A.2d at 117 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S.Ct. 2022, 2048, 29 L.Ed.2d 564 (1971)). At that point, the Fourth Amendment would apply to the party's actions. A private individual may become an agent or instrumentality of the state, the court explained, "if the government is involved in the development of a plan which is later carried out by private persons [citations omitted], or stands by while a private citizen seizes the desired evidence." *Id.* (citing *Moody v. United States*, 163 A.2d 337 (D.C.Mun.App. 1960)).

The situation that had confronted the court in *Moody* involved an unlawful entry and petit larceny case. The complaining witness gathered several items from the defendant's apartment which were plainly visible from the hallway, and handed them to the police officer who had remained in the hallway. According to the testimony, the door to appellant's apartment was open and the missing items were scattered around the room. The complainant entered the room, collected what he claimed as his, then handed the items to the officers who had remained in the hallway. The court held that the complainant "acted as an arm of the police in reducing the articles to possession," *Moody, supra,* 163 A.2d at 340, in spite of the fact that "[t]here was no indication in the record that the officer did anything to induce [complainant's] actions or that he made any effort to deter him." *Id.* at 339. The court wrote that:

> The construction to be attached to the Fourth Amendment does not permit of evasion by circuitous means. The protection thus afforded may be violated just as effectively through the intervening agency of one not a policeman. While no objection can be raised to the propriety of the arresting officer's conduct in merely viewing the articles from the adjacent hallway, we cannot characterize him as a willing but innocent beneficiary in standing silently by while the appropriation was taking place. The officer certainly recognized the evidentiary value of the goods themselves.

*Id.* at 340. The court articulated the test as "whether there was such involvement on the part of the arresting officer ... that responsibility for the search and seizure

---

8. Now codified as D.C.Code § 4-114 (1981).

9. The Supreme Court commented on the status of special police officers in a different context in *NLRB v. Jones & Laughlin Steel Corp.,* 331 U.S. 416, 67 S.Ct. 1274, 91 L.Ed. 1575 (1947). In holding that private security guards who were deputized special police officers were still company "employees" under the National Labor Relations Act, the Court stated:

> It is a common practice in this country for private watchmen or guards to be vested with the powers of policemen, sheriffs, or peace officers to protect the private property of their private employers. And when they are performing their police functions, they are acting as public officers and assume all the powers and liabilities attaching thereto.

*Id.* at 429, 67 S.Ct. at 1281.

The Supreme Court has also held that special police officers, of the sort commissioned in the District of Columbia, can be held liable for actions taken "under color of law" under 18 U.S.C. § 52 (1946), if done while acting under the authority granted them. *Williams v. United States,* 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774 (1951).

must be attributed to the police authorities." *Id.*

■ It is true that SPO's are not in all their actions equated with a regular police officer. *See United States v. McDougald,* 350 A.2d 375 (D.C.1976) (no duty to discuss case with defense counsel). However, here the Fourth Amendment challenge involves the arrest of a suspect and actions related thereto—the broad SPO power which distinguishes the SPO from a private citizen. *Id.* at 378; *see* note 3, *supra.* Security Officer Mitchell testified that one of the SPO's carried appellant's bag from the place of arrest back to the store. There is no indication that Mitchell searched the bag solely on her own initiative. She searched the bag in the presence of at least three SPO's, including her supervisor. These facts bring her action under the *Moody* exception to *Lima. See also Lucas v. United States,* 411 A.2d 360, 362–63 (D.C. 1980) (state action found where SPO's involved in use of store's sensormatic device). To hold otherwise would mean that store security personnel could continually evade the Fourth Amendment by "circuitous means," simply by having a security officer or unlicensed employee conduct the search after a suspect had been apprehended.

### III.

The trial court rejected the government's alternative argument that even if the Fourth Amendment applied, the search was made pursuant to a lawful arrest under *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), and *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). It did so on the ground that while an immediate search at the moment of seizure in the park would have been lawful, here the defendant had been brought back to the security office and the search made then, after the bag had come into the firm custody of the arresting officers.

That the SPO's could lawfully have searched the tote bag at the time of the apprehension in the library park we do not doubt. The tote bag was not closed and was within defendant's area of control, indeed on her shoulder, and a natural depository for weapons or evidence. *United States v. Robinson, supra; Chimel v. California, supra.* This would be so notwithstanding that the SPO's had taken the bag into their control prior to the search. Whatever doubt *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977),[10] may have cast on the proposition was dispelled by *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). In that case, a police officer stopped a car, ordered the driver and his passengers outside of the car, placed them under arrest and searched each. Then the officer searched the passenger compartment of the car and found on the back seat a black leather jacket. Unzipping one of the pockets of the jacket, he found cocaine. The Supreme Court upheld the search as validly incident to a lawful arrest, since the entire passenger compartment might be deemed an area "within the immediate control of the arrestee." The Court specifically rejected the argument that the state

---

10. In *Chadwick,* the defendants were arrested in front of a Boston train station while standing next to an open car trunk in which they had just placed a 200–pound doublelocked footlocker. The defendants and the footlocker were taken to the Federal Building where, an hour and a half later, the federal agents searched the footlocker without a warrant. The Court held that this was not a lawful search incident to arrest. In the course of its opinion, it stated:

> Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is

no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.

*Id.,* 433 U.S. at 15, 97 S.Ct. at 2485. *Cf. Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) (no "exigent circumstances" justified search of unlocked luggage seized by police in trunk of taxicab prior to arrest of passenger). The precise operative rationale underlying the *Chadwick* decision is a matter of considerable discussion. *See e.g.,* W. LaFave, Search and Seizure, § 5.5 (1978 and Supp.1986).

court had relied upon in holding the seizure unlawful:

> It seems to have been the theory of the Court of Appeals that the search and seizure in the present case could not have been incident to the respondent's arrest, because Trooper Nicot, by the very act of searching the respondent's jacket and seizing the contents of its pocket, had gained "exclusive control" of them, 50 N.Y.2d 447, 451 [429 N.Y.S.2d 574, 576], 407 N.E.2d 420, 422. But under this fallacious theory no search or seizure incident to a lawful custodial arrest would ever be valid; by seizing an article even on the arrestee's person, an officer may be said to have reduced that article to "his exclusive control."

*Id.* at 461 n. 5, 101 S.Ct. at 2865 n. 5. Instead, the Court characterized *Chadwick* as not involving even an "arguably valid search incident to a lawful custodial arrest," noting that in *Chadwick* the search was conducted "more than an hour after federal agents had gained exclusive control of the footlocker and long after respondents were securely in custody." 453 U.S.

at 462, 101 S.Ct. at 2865. Our own circuit, along with others, has relied on the *Belton* analysis in rejecting attempts to limit a search of container-like items incident to arrest on an "exclusive control" theory. *See United States v. Brown,* 217 U.S.App. D.C. 79, 671 F.2d 585 (1982) (zippered leather pouch); *United States v. Litman,* 739 F.2d 137 (4th Cir.1984) (en banc) (shoulder bag); *United States v. Mefford,* 658 F.2d 588 (8th Cir.1981), *cert. denied,* 455 U.S. 1003, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982) (paper grocery bag); *United States v. Singer,* 687 F.2d 1135 (8th Cir.1982) (folder containing documents), *rev'd on other grounds,* 710 F.2d 431 (1983) (en banc).

The only issue in this case,[11] then, is whether it was fatal to delay searching the open tote bag [12] until the injured Alston had been helped back across the street to the security office in the department store.

 No flat rule exists that a search must be conducted, if at all, on the exact spot and at the precise moment where a suspect is first apprehended.[13] In *United*

---

**11.** On the facts before us, we do not find a definitive answer to this issue in two cases in our jurisdiction involving delayed searches. *See In re B.K.C.,* 413 A.2d 894 (D.C.1980), discussed in note 12, *infra,* and *Dunham v. District of Columbia,* 442 A.2d 121 (D.C.1982), discussed in note 13 *infra.*

**12.** We need not explore here any limitations that possibly may be imposed on the timing of the right to search by factors such as the degree to which the contents of a container are secreted from inspection or a lack of expectation of locating evidence relating to the arrest or an absence of explanation for a delay in the search. In *In re B.K.C., supra,* an SPO was escorting D.A.V. out of the store. As he was leaving, D.A.V. took a swing at the SPO, who chased D.A.V. and brought him back to the security office with the intent of charging him with assault on a police officer. Under circumstances not clear from the record, the SPO obtained possession of a briefcase being carried by D.A.V. at the time of his arrest (but belonging to appellant, B.K.C.), and searched it in the presence of D.A.V. in the security office. A stolen shirt was found inside. The evidence was suppressed as not obtained incident to a lawful arrest.

The briefcase was closed, although unlocked, and we specifically noted that "the nature of the

briefcase as a repository of personal effects creates a high expectation that its contents will remain private." 413 A.2d at 900. The search bore no relation to the offense for which the arrest was made, and was conducted under circumstances concerning which the record before the court was "barren."

Furthermore, we felt largely guided by the rationale expressed in the then-recent *Chadwick* case that a search incident to arrest was not allowed once an item of luggage or the like was reduced to the control of the arresting officer, thus eliminating danger of weapon seizure or destruction of property—a proposition undercut by the subsequent *Belton* holding, as has been discussed *supra.*

**13.** This proposition would seem quite evident as to personal items still possessed by the arrested person at the time of a subsequent seizure and search, at least at the place of detention. *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 1771 (1974) (search of clothes taken from defendant at city jail ten hours after arrest held valid, since it is "plain that searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention," *id.* at 803, 94 S.Ct. at 1237). We relied upon *Edwards* in our holding in *Dunham v.*

*States v. Porter*, 738 F.2d 622 (4th Cir.) (en banc), *cert. denied*, 469 U.S. 983, 105 S.Ct. 389, 83 L.Ed.2d 323 (1984), a police officer stopped a suspect in the passenger waiting area who was carrying a piece of carry-on luggage. After inquiry, he asked her to accompany him to the FAA police office at the airport. The two "walked some 500 feet through the airport concourse, down a series of steps, and through a tunnel to the FAA police office." *Id.* at 624. Once in the office, the police officer asked the suspect for identification; she began looking through her carry-on bag. With her consent, he looked into the bag "for any type of weapon." He then asked her to accompany him to the Drug Enforcement Administration office about 50 feet away. The

record did not indicate who carried the bag to the DEA office. At that place, the officer made a thorough search of the bag and found a plastic bag with cocaine.[14] The en banc court was willing to assume that the suspect was under arrest from the time of the original encounter in the passenger waiting area. It held "irrelevant" the fact that the suspect may have been arrested on the way to the DEA office and searched after she arrived there, noting that only 15 minutes had elapsed between the time she left the plane and the time her bag was searched.[15]

In *United States v. Fleming*, 677 F.2d 602 (7th Cir.1982), Rolenc and Fleming were arrested in the doorway of a home.

*United States*, 442 A.2d 121 (D.C.1982). In that case, a woman was arrested in her office and reached for her purse to take it with her to the police station. One of the arresting officers took possession of the purse, searched it for weaponry, and then returned it to the defendant. Three hours later, at the police station, the purse was again seized and searched, this time more thoroughly, at a point some four or five feet from the defendant but apparently within her reach. Citing both *Edwards* and *Belton*, we sustained the delayed search, noting also that the "second look" was unobjectionable in part because the first peremptory search had reduced any reasonable expectation of privacy in the purse. (Since *Illinois v. Lafayette*, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983), such instances can generally be justified as inventory searches.) Some cases in other jurisdictions have sustained searches of items under various circumstances even when made long after lawful seizure by the police. *See* LaFave, SEARCH AND SEIZURE § 5.3(b) (1978 and Supp.1986) ("the delayed search and the second look"); Annot., 19 A.L.R.3d 727 (1968 & 1986 Supp.) ("validity of nonconsensual search and seizure made without warrant after lawful arrest as affected by lapse of time between, or difference in place of, arrest and search"). *Chadwick* itself indicated its holding was focused upon "luggage and other personal property not immediately associated with the person of the arrestee." 433 U.S. at 15, 97 S.Ct. at 2485.

In *United States v. Johns*, 469 U.S. 478, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985), the Supreme Court upheld a warrantless search of packages three days after they had been removed from the back of a pick up truck that had been searched on probable cause that it contained contraband. It has been argued that this case erodes any contemporaneous requirement in ar-

rest searches generally and indicates that if the search could have been made at the time of seizure, it can be made subsequently. *See United States v. Andrade*, 784 F.2d 1431 (9th Cir. 1986) (one hour delay between arrest and search of garment bag; court doesn't reach issue since inevitable discovery doctrine applies).

**14.** The search was prompted by the suspect's producing an envelope with marijuana cigarettes in the DEA office. At that point the office made a formal arrest, advised the suspect of her *Miranda* rights, and proceeded to search the bag. The conviction was for possession of the cocaine, not the marijuana.

**15.** The court in *Porter* noted that at the time of the second search, the bag was within the suspect's reach. Although the court appears to consider this fact important, it is not entirely clear that it is crucial to the result; the court also relies on the *Belton* holding, discussed above, rejecting the "exclusive control" interpretation of *Chadwick*. Cf. *United States v. Silva*, 745 F.2d 840, 847 (4th Cir.1984), *cert. denied*, 470 U.S. 1031, 105 S.Ct. 1404, 84 L.Ed.2d 791 (1985) (locked zippered bag in motel room where defendant arrested may be searched even after defendant was handcuffed). The court did not mention the first consensual search as having reduced any expectation of privacy in the bag. Reference to the bag's being within reach of the suspect stemmed from the rationale expressed in a seminal case, but apparently since modified to some degree such as by *Belton* and its progeny, that a search incident to arrest is justified to prevent the arrestee from seizing a weapon or destroying evidence. *Chimel v. California, supra*, 395 U.S. at 762–63, 89 S.Ct. at 2039–40. It also indicated that the police officer was not in exclusive control of the bag.

Each was carrying a folded paper bag secured with rubber bands which he dropped on being arrested. While Fleming's bag was searched immediately, Rolenc's bag was not opened until five minutes later when Rolenc had been taken to the street and handcuffed. The court granted that "it is surely possible for a *Chimel* search to be undertaken too long after the arrest and too far from the arrestee's person. That is the lesson of *Chadwick." Id.* at 607. But it was unwilling to "impose on police a requirement that the search be absolutely contemporaneous with the arrest" and upheld the delayed search as reasonable.

 Thus, the fact that the Woodward & Lothrop security officers did not search the tote bag immediately upon the apprehension of appellant in the park is not necessarily determinative. Rather, the issue is whether the search took place at a time and under circumstances where it can fairly be said that the search took place as a "contemporaneous incident," *Smith v. United States*, 435 A.2d 1066, 1068 (D.C.1981), *cert. denied*, 455 U.S. 950, 102 S.Ct. 1454, 71 L.Ed.2d 665 (1982) (quoting *Belton, supra*, 453 U.S. at 460, 101 S.Ct. at 2864), and not "remote in time or place" from the arrest. *In re B.K.C., supra*, 413 A.2d at 902 (citing *Preston v. United States*, 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964)). Here, we think that a common-sense view of the events that transpired compels a holding that the search of the tote bag was made incident to the process of a lawful arrest. To move the injured appellant from the public park to the privacy of the security office across the street for further processing was entirely reasonable and sensible. There the search took place without any indication of undue delay and as part of an uninterrupted immediate custodial process. The item searched was an open tote bag. The search was directly related to the cause of the arrest.

If the officers had been mistaken in their belief that appellant had stolen goods from the store, an immediate search rather than awaiting the procurement of a search warrant would result in prompt release of the suspect. We cannot think that after *Belton's* rejection of the "exclusive control" reading of *Chadwick*, the fact that the bag was carried back to the security office by an SPO rather than by appellant herself can be determinative, so long as the search can fairly be viewed as carried out in the context of a lawful arrest process. We so view it.

We hold that upon the facts of this case, the search was made incident to a lawful arrest and was reasonable within the meaning of the Fourth Amendment.

*Affirmed.*