Jason **LIMPUANGTHIP**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 05–CM–951.

District of Columbia Court of Appeals.

Argued April 12, 2007.
Decided Sept. 27, 2007.

---

Thomas Key, Washington, DC, for appellant.

Anne Y. Park, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Lisa H. Schertler, and Fernando Campoamor–Sanchez, Assistant United States Attorneys, were on the brief, for appellee.

Before REID, Associate Judge, and WAGNER and BELSON, Senior Judges.

BELSON, Senior Judge:

Appellant Jason Limpuangthip, a college student, was convicted after a bench trial of possession with intent to distribute marijuana, in violation of D.C.Code § 48–904.01(a)(1) (2001), possession of drug paraphernalia, in violation of D.C.Code § 33–550 (2001), and possession of psilocybin (mushrooms), in violation of D.C.Code § 48–904.01(d) (2001). Critical evidence supporting the charges was obtained from appellant's dormitory room at George Washington University, a private university, as a result of a warrantless search and seizure by Penny Davis, a community director at the University. Two University police officers from the George Washington University Police Department ("the University Police") and a residential assistant ("R.A.") were present at the time of the search. On appeal, appellant contends that the search that resulted in his arrest violated the Fourth Amendment of the Constitution. We conclude that the search, as it was conducted, did not violate appellant's rights under the Fourth Amendment and, accordingly, affirm the conviction.

## I.

Appellant brought a motion to suppress statements and tangible evidence, contending that the evidence supporting the charges against him—i.e., statements, drugs, drug paraphernalia and cash—was illegally obtained by Ms. Davis and the University Police. At a suppression hearing, Ms. Davis testified that she was in charge of supervising three dormitories, including one called the Ivory Tower where appellant lived. As part of her duties, she enforced the University's residential community code of conduct guidelines and conducted administrative searches. She testified that these searches were performed by administrators when there was a concern that activities in a room could endanger the health and welfare of the students. She received training in how to conduct these searches

from the University Police.[1] The University Police are employees of the University who are appointed as Special Police Officers ("SPOs") by the Mayor of the District of Columbia for the purpose of protecting property on the premises of their employer, and are authorized to exercise arrest powers broader than that of ordinary citizens and security guards.

Ms. Davis testified that she conducted an administrative search in appellant's dorm room, which was initiated when the University Police received an anonymous tip on its website concerning drugs in Room 715 of the Ivory Tower building. The University Police contacted the community director "on call" about the tip, and that person contacted Ms. Davis regarding an administrative search of the room. Ms. Davis then called the University Police to request their presence during the search because she wanted them to provide evidence bags and security. The University Police were in "full uniform," and they were carrying batons and radios, but no firearms.

When Ms. Davis, an R.A. and two SPOs got to room 715, Ms. Davis knocked on the door, and then opened it with a master key which she obtained from one of the SPOs when there was no response. Ms. Davis testified that she "could have obtained the master key in another way." The dorm accommodation was a two-bedroom suite, with a bedroom on either side of a central living area. Ms. Davis testified that once inside, only she and no one else conducted the search. Appellant arrived after a few minutes, and Ms. Davis explained to him that she had information that there were drugs in the apartment and that she was there to perform an administrative search. She requested that he stay in the room until she finished conducting her search. She asked appellant if there was anything he wanted "to present at this time," and he retrieved a wooden case from his desk and a black bag from behind his bed. The case contained a green substance that looked and smelled like marijuana, and the bag contained a bong and two small pipes. Ms. Davis then proceeded to search appellant's bedroom, where she found more drugs and drug paraphernalia. She also found two wallets, which together contained around $5,860.[2] When she asked appellant why he had so much money, he replied that he had received the money as gifts or presents. According to Ms. Davis, appellant acknowledged that the contraband belonged to him.

Ms. Davis placed the contraband in evidence bags provided by the University Police. On cross-examination, she testified that the officers held the bags open for her while she collected the contraband. After the search, one of the University Police officers who was present telephoned the Metropolitan Police Department ("MPD") because he was concerned that the amount of marijuana and money recovered "could

---

1. Her training consisted of four or five hours spent with University Police corporals who made presentations, conducted question and answer sessions, and identified illegal substances. The training concluded with Ms. Davis's performing an administrative search where the officers had "set up a standard residence hall room with several items, and [the University administrators'] basic directive [was] to find as many [of the items] as possible." In reference to her training, Ms. Davis testified to the following:

And during that training session, it is made very clear to us as administrators that we are the only ones to conduct the searches, that University [P]olice have no role in that, and that if there ever is any concern about that, that the search can actually be thrown out if University [P]olice contribute to that search.

2. In addition, appellant was carrying $197 on his person.

be constituted as distribution." When the MPD officers arrived, Ms. Davis showed them the evidence bags and told them what appellant had said.

Ms. Davis testified that the purpose of her search "was to identify any health or safety hazards, to identify any problematic activities that might be occurring in the residence hall," not to "collect evidence for a criminal case." The court admitted into evidence an unsigned "standard residence hall license agreement," which Ms. Davis identified as "the type of agreement" that all students must sign before they can live in a dormitory. The trial court found that appellant had signed the license agreement, and in so doing had agreed to allow authorized representatives of the University to inspect his room at any time for violations of University regulations, including the possession of illegal substances.[3] Thus, there is no contention in this case that the University community director, Ms. Davis, lacked any required reasonable or probable cause for an administrative search.

The trial court concluded that the search did not violate appellant's Fourth Amendment rights; rather, in conducting the search, Ms. Davis had a "legitimate purpose to take cognizance of what goes on in the dormitory rooms and to ensure that there are not illegal substances or ... any other sort of criminal activities afoot there in addition to maintenance issues, in addition to health and safety issues." The court found that the University Police officers were SPOs "who had the commission that all [SPOs] in D.C. have which basically gives them the ... limited authority to arrest and search within their jurisdiction." However, the SPOs "never needed to and never exercised any of that authority with respect to the search of appellant's dormitory room." Furthermore, the court found that it was Ms. Davis who made the decision to search room 715, and that she requested the company of the SPOs, questioned appellant, and "did all of the searching." The SPOs "only assisted in terms of providing bags and being able to take away what was recovered...." Based on these factual findings the trial court denied the motion to suppress, concluding that "there was no state action involved in this search" and "the action ... taken by the [SPOs] did not ... turn this administrative search into a governmental search." Ms. Davis' motions-hearing testimony was later incorporated for purposes of the trial. At the conclusion of the trial, the court found appellant guilty of the charged offenses, noting that Ms. Davis "was a very credible witness" whose testimony the court credited "in its entirety."

## II.

On appeal from a denial of a motion to suppress, this court reviews the trial court's legal conclusions *de novo* and defers to the trial court's findings of fact unless they are clearly erroneous. *See Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911

---

3. Paragraph 4 of the agreement required residents to observe the University's residence hall rules and regulations. Paragraph 14 of the license agreement stated the following:
 The University reserves the right for authorized representatives of the University to enter premises at any time for the repair and maintenance of the premises or the inspection thereof pursuant to University rules and regulations. The University further reserves the right to inspect a room at any time and its contents for violations of University or residence hall regulations including but not limited to possessing illegal substances or substances believed by staff to be illegal or conducting activities that could endanger the life, safety, order, or welfare of members of the University community.

(1996); *see also In re T.H.*, 898 A.2d 908, 912 (D.C.2006). We also view the evidence presented at the suppression hearing in the light most favorable to the government, drawing all reasonable inferences in the government's favor. *See In re T.H., supra*, 898 A.2d at 912; *see also Womack v. United States*, 673 A.2d 603, 607 (D.C. 1996).

▮ The Fourth Amendment to the United States Constitution protects "the right of the people to be secure in their persóns, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. Evidence obtained by searches conducted in violation of the Fourth Amendment is inadmissible. *Thompson v. United States*, 444 A.2d 972, 973 (D.C.1982) (citing *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)). "[T]he protection of the Fourth Amendment is applicable to intrusions of an individual's privacy interests by governmental officers and, not generally, to those made by private parties." *United States v. Lima*, 424 A.2d 113, 117 (D.C.1980) (en banc). However, where "[a] private party, 'in light of all the circumstances of the case must be regarded as having acted as an "instrument" or agent of the state,' the Fourth Amendment is called into play." *Id.* (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)). "What can constitute sufficient government involvement in a search or seizure to trigger application of the Fourth Amendment requires a case by case determination." *Id.*

▮ Preliminarily, we note the government's concession that appellant had a legitimate expectation of privacy in his college dormitory room to contest the search.

Therefore, we need not determine this threshold issue. It is also undisputed that Ms. Davis and the SPOs were employees of George Washington University, a private institution. Appellant argues, however, that the involvement of the SPOs in this case amounted to state action on their part and that their presence and assistance transformed Ms. Davis into an instrumentality of the state. Thus, the issue before us is "whether there was sufficient 'governmental involvement' in the search to bring into play the constraints of the Fourth Amendment." *Alston v. United States*, 518 A.2d 439, 441 (D.C.1986). We conclude that neither the SPOs nor Ms. Davis acted as agents of the state.

### III.

▮ In the District of Columbia, SPOs are appointed by the Mayor upon the "application of any corporation or individual ... for duty in connection with the property of, or under the charge of, such corporation or individual." D.C.Code § 5–129.02 (2001). SPOs are "commissioned for the special purpose of protecting property on the premises of the employer." *Franklin v. United States*, 271 A.2d 784, 785 (D.C. 1970). This commission "authorizes him or her to exercise arrest powers significantly broader than those of ordinary citizens or licensed security guards." *Woodward & Lothrop v. Hillary*, 598 A.2d 1142, 1144 n. 4 (D.C.1991) (citing *Alston, supra*, 518 A.2d at 440 n. 3). In particular, they "have the same powers as a law enforcement officer to arrest without warrant for offenses committed within premises to which his jurisdiction extends...." D.C.Code § 23–582(a) (2001).[4] This court

---

4. In *Moorehead v. District of Columbia*, 747 A.2d 138, 143 n. 8 (D.C.2000), a civil case, this court listed several similarities between SPOs and regular police officers:

For example: (1) both are required to follow rules governing the Metropolitan Police Department; (2) both must answer to the Chief of Police; (3) both may carry pistols

has said that where security personnel of a private employer have "powers akin to that of a regular police officer and [are] appointed by a governmental official, even though employed by a private company, sufficient trappings of state authority have been found to trigger Fourth Amendment restrictions." *Lima, supra,* 424 A.2d at 118. We clarified, however, that "the commissioning of [SPOs] by the District of Columbia does not make all their actions attributable to the government." *Id.* at 119.

■ The government argues that the Fourth Amendment is not implicated in this case because the SPOs were not "acting as agents of the state, nor were they significantly involved in the search of appellant's dormitory room." It acknowledges that SPOs act as agents of the state when they exercise their arrest power. Indeed, we have stated that "[t]he power of arrest of a special policeman is the sole factor which distinguishes the holder of a special police commission from a private citizen." *United States v. McDougald,* 350 A.2d 375, 378 (D.C.1976); *Hillary, supra,* 598 A.2d at 1146. Such language "suggest[s] that when [an SPO] performs the distinctive function authorized by his commission, he acts as an agent of the state." *See Hillary,* 598 A.2d at 1146 n. 7. Thus, SPOs "are not 'in all their actions' equated with regular police officers, but ... [an SPO] does act as a state agent or instrument when the challenge 'involves the arrest of a suspect and actions related there-

to....'" *Hillary,* 598 A.2d at 1146 (citing *Alston, supra,* 518 A.2d at 439).

We have not articulated what is required to create a nexus with the state where the SPO has not made an arrest. However, in determining whether state action exists, we have not focused on the fact of an arrest alone. For instance, although an arrest took place in *Lucas v. United States,* 411 A.2d 360, 362 (D.C.1980), we determined whether SPOs were public officers by focusing broadly on whether they were performing their "police" functions. In that case, two SPOs employed by a department store approached and questioned a customer, inquired whether she had receipts, and conducted a search after the plastic tags in her bag set off a "sensormatic device," which the SPOs monitored. *Id.* at 362. We held that the SPOs were acting as agents of the state "because of the nature of their duties." *Id.* We further stated that "when they are performing their police functions, they are acting as public officers and assume all the liabilities attaching thereto." *Id.* We also concluded that the SPOs were significantly involved in the use of the sensormatic device because they operated and monitored it. *Id.* Thus, we held that there was sufficient state action to trigger Fourth Amendment protections.

Similarly, in *United States v. McDougald, supra,* a case in which we refused to attribute an alleged due process violation to the state, we focused on whether the

---

and use handcuffs (but a special police officer's right to carry a pistol is limited to the property which the SPO protects and travel to and from that property); (4) both wear badges and uniforms; and (5) both may make arrests upon probable cause. In addition, an assault on [an SPO] is criminally punishable as an assault on a police officer.... Similarly, a person who impersonates [an SPO] is guilty of impersonating a police officer....

(internal citations omitted). Our opinion then went on to list several differences distinguishing SPOs from regular police officers which were relevant to the court's analysis of whether there was a *master-servant* relationship between SPOs and the District of Columbia for purposes of application of the doctrine of *respondeat superior. Id.* at 144.

SPO was performing a "public" or a "private" function in order to determine whether the Fourth Amendment was implicated. 350 A.2d at 378. In that case, the challenged act by the SPO was a conversation in which he told a witness (a subordinate security officer) not to discuss a case with a defense attorney unless a prosecutor was present. *Id.* at 377. We held that the SPO "was acting as a private citizen on behalf of his private employer when he conveyed [his employer's store] policy.... He was not performing a public function authorized by his commission as a special policeman." *Id.* at 378. Thus, in *Lucas* and *McDougald,* we decided whether the SPOs were state actors by determining whether the functions he or she was performing in the context of those particular cases were "public" or "private."

In *Alston, supra,* we equated actions by SPOs with the actions of regular police officers based on the fact of an arrest together with the SPOs' involvement in the search. 518 A.2d at 443. In that case, after two SPOs helped a department store security officer chase a shoplifting suspect after the suspect ran from the store, caught her in a nearby park when she fell and brought her back to the store, the department store security officer searched the suspect's bag in the company of the three SPOs, including her supervisor. *Id.* at 442. We concluded that the security officer, although a private employee, was subject to the Fourth Amendment at the time of the search because certain facts rendered her an instrument of the state: (1) the SPOs had made an arrest, (2) one of the SPOs carried the suspect's bag from the place of arrest back to the store, (3) there was "no indication that the private officer searched the bag solely on her own initiative," and (4) the private officer conducted the search "in the presence of at least three SPOs, including her supervisor." *Id.* at 443. Thus, the court found

that state action was implicated in *Alston* because the SPOs' arrest of the suspect and their other actions implemented their authority granted by the state. The circumstances surrounding their exercise of authority, in turn, transformed the private security officer into an instrument of the state. *Id.* at 442 (citing *Moody v. United States,* 163 A.2d 337 (D.C.1960)); *see also Hillary, supra,* 598 A.2d at 1145–46 ("[T]he required nexus with the state is furnished not by the fact of the commission alone ... but by the convergence of the authority bestowed by the commission and the officers' *actions.*") (emphasis added).

 Thus, an SPO is a state or "public" actor when he or she invokes state authority through manner, word or deed, i.e., he or she acts like a regular police officer. This conclusion is consistent with cases in which the Supreme Court has addressed the constitutional status of SPOs who work for private employers but who are "deputized" with state authority. In *Williams v. United States,* 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774 (1951), the Court considered a situation where a lumber company hired an SPO to investigate a series of thefts. *Id.* at 98, 71 S.Ct. 576. The SPO took several individuals to a shack and obtained their confessions using violence. *Id.* at 98–99, 71 S.Ct. 576. A regular police officer was present during the beatings, and the SPO "went about flashing his badge." *Id.* at 99, 71 S.Ct. 576. In holding that the SPO acted "under color of law," under 18 U.S.C. § 52 (1946), the Court stated that "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color' of state law." *Id.* at 99, 71 S.Ct. 576. The Court noted the presence of the regular police officer as evidence of "an investigation conducted under the aegis of the

state." *Id.* at 99–100, 71 S.Ct. 576. However, the Court also focused on the conduct of the SPO, noting that "[he] was no mere interloper but had a semblance of policeman's power from Florida" and that there was "evidence that he acted under authority of Florida law; and the manner of his conduct of the interrogations makes clear that he was asserting the authority granted him and not acting in the role of a private person." *Id.* at 100, 71 S.Ct. 576.

Later, in *Griffin v. Maryland,* 378 U.S. 130, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964), the Supreme Court considered whether an SPO employed by a private amusement park was a state actor.[5] Upon the park manager's request, the SPO approached four African–Americans and ordered them to leave the park, informing them of the park's then-existing policy of segregation. *Id.* at 132, 84 S.Ct. 1770. When they refused to leave, the SPO told them they were under arrest for trespassing and took them to a Montgomery County police station, where he filled out a warrant as a deputy sheriff. *Id.* at 133, 84 S.Ct. 1770. The Maryland Court of Appeals affirmed the appellants' convictions for criminal trespass and rejected their state action claims, reasoning that because the appellants had committed a misdemeanor in front of the SPO, he could arrest them "either in his private capacity as an agent or employee of the ... park or in his limited capacity as [an SPO] in the amusement park...." *Id.* at 134, 84 S.Ct. 1770.

The Supreme Court reversed, concluding that the SPO, "in ordering the petitioners to leave the park and in arresting and instituting prosecutions against them— purported to exercise the authority of a deputy sheriff." *Id.* at 135, 84 S.Ct. 1770. This conclusion was based on the "character of the authority which [the SPO] ini-

tially purported to exercise," including that he "wore a sheriff's badge and consistently identified himself as a deputy sheriff rather than as an employee of the park." *Id.* The Court held that "[i]f an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that he might have taken the same action had he acted in a purely private capacity or that the particular action which he took was not authorized by state law." *Id.* at 135, 84 S.Ct. 1770. Thus, the court found that the SPO was a state actor because he acted pursuant to his state authority, i.e., he acted like a regular police officer rather than a private employee.

In this case, the SPOs were "deputized" with special legal powers pursuant to D.C.Code § 23–582(a); however, their actions were directed and controlled by the University whose administrative official, Ms. Davis, made the decision to conduct the search. From the moment Ms. Davis telephoned the SPOs and asked them to accompany her to room 715, Ms. Davis was in control of the situation. She alone spoke to appellant and conducted the search, while the SPOs took little, if any, initiative. They accompanied Ms. Davis to room 715 at her request, produced a master key and evidence bags for her use, and held the evidence bags while she conducted the search. We have held that SPOs are not in all their actions equated with regular police officers. *Woodward & Lothrop v. Hillary, supra,* 598 A.2d at 1146 (citing *Alston, supra,* 518 A.2d at 443). Rather, the relevant circumstances surrounding the actions in question must be weighed. While the fact that an SPO wore a uniform and carried a baton and a radio, as occurred here, may be a relevant factor, *see Williams, supra,* 341 U.S. at 99,

---

**5.** The SPO in *Griffin* was "deputized" pursuant to a Maryland statute similar to D.C.Code

§ 5–129.02 (2001). *See* 378 U.S. at 132 n. 1, 84 S.Ct. 1770.

71 S.Ct. 576 (fact that SPO "went about flashing his badge" relevant to whether he acted under color of law), it does not of itself amount to an assertion of state authority. More is required.

In contrast to the passive behavior of the SPOs in this case, in each of the cases discussed above in which a court found that the SPOs acted as state agents, the SPOs were actively asserting their authority from the state to a significant degree at the time of the challenged act. As they involved questioning, searching, seizing, beating or arresting a suspect, each of the cases is supported by the Supreme Court's holding in *Griffin v. Maryland* that "[i]f an individual is possessed of state authority and purports to act under that authority, his action is state action." 378 U.S. at 135, 84 S.Ct. 1770. In *Lucas* and *Alston*, for example, there were greater indications than here that the SPOs were acting in their "public" capacity. In both cases, we noted the extent of the statutory power employed by the SPOs, i.e., the extent to which the SPOs detained or arrested a suspect or oversaw a search. In *Lucas*, the SPOs stopped the suspect and searched her bag. 411 A.2d at 362. In *Alston*, there was a chase and an arrest. 518 A.2d at 441. Here, the SPOs did not employ the arrest power given them pursuant to D.C.Code § 23–582. Further, in both *Alston* and *Lucas*, we noted whether the SPOs, as opposed to a private party, initiated the search. In *Alston*, we inferred that the SPOs advised the private security guard to conduct the search, 518

A.2d at 443, and in *Lucas*, the SPOs acted on their own initiative in detaining and searching the suspect. 411 A.2d at 362. Here, by contrast, the trial court found as a matter of fact that "[i]t was Ms. Davis who made the decision to search room 715." Finally, in both *Lucas* and *Alston*, there was direct involvement in the search by the SPOs. In *Lucas*, the SPOs were directly involved because they monitored the sensormatic machine. 411 A.2d at 362. In *Alston*, the SPOs were directly involved in the search because they detained the suspect and thereafter the private employee was under their influence. 518 A.2d at 443. Here, the evidence showed that the SPOs' involvement in the search was peripheral and did not indicate that the SPOs were acting in their "public" role or influencing Ms. Davis's actions. Thus, we conclude that under the circumstances of this case, the SPOs were not state actors.[6]

Appellant argues that the "ongoing cooperation" between the University Police and the University administrators, including that members of the University Police passed on the anonymous tip, supplied the key to room 715, and were involved in the search, demonstrates an effort to evade the Fourth Amendment. We cannot agree that the facts of this case indicate a circumvention of the Fourth Amendment. According to Ms. Davis's testimony, which the trial court credited, University administrative searches are to be conducted only by administrators and that the University Police are to "have no role in that" because

---

**6.** Appellant relies heavily on our decision in *Moody, supra,* 163 A.2d at 337. *Moody* involved a regular police officer, not SPOs, and it is distinguishable from this situation because the SPOs here were not state actors. In *Moody,* the complainant encountered a Metropolitan Police officer on the street, and told the officer that the suspect had stolen from him. 163 A.2d at 338. After taking the suspect into custody, the officer walked with

the complainant to the suspect's apartment, saw the stolen goods through the open door, and stood there as the complainant retrieved his goods and then handed them to the officer who had remained in the hallway. *Id.* at 339. We concluded in that case that the complainant, a private citizen, acted as an "arm of the police in reducing the articles to possession." *Id.* at 340.

"the search can actually be thrown out if the University [P]olice contribute to that search." This testimony does not tend to establish that the University policy was designed to circumvent the Fourth Amendment. To the contrary, it is reasonable and appropriate for a university to apply its policies regarding student health and welfare in a manner which, if an administrative search should happen to uncover contraband, does not eliminate any possibility of subsequent prosecution by civil authorities.

The trial court here found that the University administrator, not SPOs, made the decision to conduct the search. As these findings are supported by substantial evidence in the form of Ms. Davis's testimony, we cannot hold that they are clearly erroneous. Thus, appellant's circumvention argument fails, as the evidence indicates that the school officials decided to conduct the search on their own. *Cf. People v. Boettner,* 80 Misc.2d 3, 362 N.Y.S.2d 365, 369 (1974) (fact that regular state police informed administrator at private university that one of its students likely possessed drugs was not enough to prove "a general agency or an implied participation" between the police and the school).

In sum, the SPOs' conduct in this case does not amount to state action. The trial court found based on record evidence that the University initiated the search and that the purpose of the search was to enforce the University's private policies.[7] Nothing done by the SPOs in this case approached the level of direct and active involvement of the SPOs found to have been state actors in *Griffin, Williams, Hil-*

*lary, Alston, Lucas* or other relevant precedents cited by appellant. The participation of the SPOs was peripheral and secondary to that of the University administrator who carried out the search. Thus, we conclude that the Fourth Amendment was not implicated.

*Affirmed.*

---

7. Because we conclude the SPOs involved in this case were not state actors, we need not consider whether appellant's consent to an administrative search by University personnel had any bearing upon the reasonableness of the search under Fourth Amendment principles. *See generally United States v. Watson,* 697 A.2d 36, 39 (D.C.1997) (discussing the objective standard by which the reasonableness of a search or seizure must be judged).