*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CF-231

JERMAINE FOGG, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CF2-10981-15)

(Hon. Neal E. Kravitz, Motions Judge)
(Hon. Danya A. Dayson, Trial Judge)

(Argued October 25, 2018                    Decided March 18, 2021)

*Sean R. Day* for appellant.

*Eric Hansford*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, *Rizwan Qureshi*, and *Christopher R. Howland*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH and MCLEESE, *Associate Judges*.

Opinion for the court by *Chief Judge* BLACKBURNE-RIGSBY.

Concurring opinion by *Associate Judge* MCLEESE at page 38.

BLACKBURNE-RIGSBY, *Chief Judge*: Appellant Jermaine Fogg appeals the denial of his motion to suppress a handgun, heroin, and drug paraphernalia recovered from bags inside the trunk of an overdue rental car during its repossession. Appellant argues that: (1) the involvement of Metropolitan Police Department ("MPD") officers at the scene of the repossession transformed the repossession agent's inventory of the car's contents into a government search, subject to the limitations of the Fourth Amendment; and (2) appellant had a reasonable expectation of privacy in the overdue rental car even though he was not authorized by its owner, Enterprise Rent-A-Car ("Enterprise"), to drive it. We hold that the repossession agent's search of appellant's bags inside the rental car was state action subject to the Fourth Amendment's prohibition of unreasonable searches and seizures. Because the search occurred without a warrant, or pursuant to any exception to the warrant requirement, the contraband discovered therein was inadmissible. Therefore, the trial court erred in denying appellant's motion to suppress, and we reverse.[1]

---

[1] Because we resolve this matter on the issue of state action, we need not decide whether appellant had a reasonable expectation of privacy in the overdue rental car. *Cf. Byrd v. United States*, 138 S. Ct. 1518, 1524 (2018) ("[S]omeone in otherwise lawful possession and control of a rental car has a reasonable expectation of privacy in it even if the rental agreement does not list him or her as an authorized driver.").

## I.  Factual and Procedural History

In the period relevant here, Terrence Ross was employed as a vehicle-recovery agent for R & R Towing and Recovery.  For more than ten years, Ross, through R & R Towing and Recovery, contracted with rental car companies EAN Holdings (which owns Alamo and National) and Enterprise to repossess vehicles and investigate auto theft and fraud.

On the evening of August 9, 2015, Ross was driving along Benning Road NE when he saw a black Ford Mustang, parked on the opposite side of the street, matching the description of a vehicle he had tried to recover for Enterprise multiple times.[2]  According to Ross, Enterprise told him that the Mustang was "linked to [the] other cars" he had repossessed earlier that year.  Ross made a U-turn and positioned his car in front of the Mustang to box it in, as another car was parked behind.  Ross

---

[2]  Prior to July 9, 2015, Enterprise sought Ross's assistance in recovering the Mustang, informing him that the car was overdue and rented, "possibly with fraudulent information," under the name Ashley Hawkins.  On July 9, he spotted the Mustang on Benning Road NE driving near the address listed for Hawkins, but was unable to catch it.  In the next few weeks, Ross saw the Mustang a second time, but again, was unable to catch it.  In this second encounter, Ross observed that the car's driver was appellant, whom Ross recognized from a repossession assignment earlier that year, in April 2015.  That assignment involved the repossession of two vehicles for Alamo, during which Ross said that appellant "came out and he retrieved property from one of the vehicles."

exited his vehicle and asked appellant, who was alone and sitting in the driver's seat, to shut off the engine. According to Ross, appellant attempted to escape by putting the Mustang in reverse; once he realized Ross's tow truck was blocking him, however, appellant stopped the vehicle and put his hands on the steering wheel. Ross walked to the driver's side door, opened it, and asked appellant to shut off the engine and exit the car. Appellant stepped out of the car and walked toward the trunk, which he opened, saying he wanted to "get [his] stuff." Ross, however, grabbed the keys from appellant's hands and closed the trunk. Ross told appellant "that he was not able to take anything out of the vehicle [because] [h]e was not the renter of the vehicle [and] anything that was in the vehicle would be held as evidence." Ross ordinarily permitted people to retrieve their belongings from repossessed vehicles but declined to do so here "in case the police wanted to go through the vehicle . . . to make sure that there was nothing that would link [the Mustang] to an auto theft ring." Ross then told appellant that because the Mustang was designated stolen in Enterprise's internal database – though it was not reported stolen to the police – Ross was repossessing the car and appellant was free to leave.

According to Ross, appellant left the scene, but returned five to ten minutes later, saying "I just want to get my stuff out of the vehicle. I don't want any problems." Ross again told appellant that he could not take anything out of the car;

appellant remained for a few minutes and left. After another five to ten minutes, appellant returned, but this time in a Nissan driven by another man. The two men exited the car and began walking towards Ross, at which point Ross called 911. Ross said that the call was "for my safety and it's, you know two against one. So, I didn't know what their intentions were." Ross again told appellant that he could not access the Mustang. When Ross received a call from MPD Officer John Javelle, Ross explained that he was attempting to repossess an overdue rental car, and the "person who was driving the car was insistent on recovering some belongings from the car;" and that after he "had sent [the individual] away several times," the individual had come back with another person. When a police vehicle arrived several minutes later, appellant and his companion returned to the Nissan and drove away. Ross told the responding officers that the Nissan "could have possibly been fraudulently rented," so they left and pulled it over at a gas station approximately 200 yards away.

After locking the Mustang, Ross drove to the gas station. There, Ross informed Officer Javelle, who had responded to the gas station, about his prior encounters with appellant, and specifically that appellant kept insisting that he be allowed to retrieve his belongings from the trunk of the car.[3] Ross requested that

---

[3] Appellant also told Officer Javelle that he was trying to get his belongings from the car.

officers be present while he searched the car, though he intended to return appellant's personal property that was in it. Ross wanted to "take [appellant's] property out and make sure that there was nothing . . . that would be harmful to [himself] or anyone else." He also wanted to conduct an initial inventory, knowing that it was "standard practice" that the car's contents would be inventoried upon arrival at the facility where it would be housed. Ross testified that it was his practice to conduct an initial inventory in order "to cover [himself]," and to give him "a general idea of what is in the vehicle when [he] drop[s] that vehicle off." He explained that "if an employee of that facility where the vehicle is housed [] has sticky fingers, I already know . . . what property was in that vehicle." Thus, Ross would know if appellant "might say that [something] was in the car that was not" upon retrieving his items from the facility.

Two other officers sitting in a police car at the gas station accompanied Ross back to the Mustang to stand by while he inventoried the car. Ross asked the officers if they wanted to search the Mustang, but both declined. Officer Javelle testified that Officer Joseph Quinlan, one of the officers present during the search, was "very adamant . . . that MPD was not going to search the car, that [MPD] did not have a search warrant, that the car was not reported stolen, and that [Officer Quinlan] wasn't going to get involved in looking through the car." Officer Quinlan and another

officer accompanied Ross to the Mustang and told him "that [he] could search the car and if [he] found anything to just let them know." Officer Javelle remained at the gas station.

With the officers standing a few feet behind him, Ross opened the Mustang's trunk and began pulling bags from the trunk, looking at their upper most contents, and placing them on the ground, while looking for anything "harmful to [him] or anyone else." As Ross reached to pick up a black plastic bag, he opened its top, which was untied, and saw the handle of a gun. Ross left the bag in the trunk and called over an officer, telling the officer "that there was something that he needed to take a look at." Ross later testified that he "basically just raised [his] hand and [] told the officers that it was their turn." The officers came over, "looked inside," and saw the gun "in plain sight." Upon seeing the gun, the MPD officers told Ross to cease his inventory and called for backup.

With Ross returning to the Mustang, Officer Javelle approached appellant at the gas station and asked him for information to verify his identity. Officer Javelle learned from MPD's NCIC database that appellant was wanted for questioning in relation to a 2014 homicide. While Officer Javelle was inquiring about the incident, which included telephoning the MPD's homicide branch, he received a radio report

that a gun had been discovered in the Mustang. Even though the NCIC notification instructed "not [to] arrest based on this information," Officer Javelle believed that the notification coupled with the radio report about the gun authorized him to detain appellant "to investigate what was going on." After placing appellant in handcuffs, Officer Javelle was unable to reach the detective assigned to the investigation, and he released appellant and told him he was free to go. Appellant left the scene on foot.

MPD then dispatched Department of Forensic Science technicians to process the gun. In the plastic bag containing the gun, the forensic technicians recovered digital scales, a plastic bag containing small plastic bags, and a clear plastic bag containing white powder, which later tested positive as heroin. Five days later, MPD officers arrested appellant pursuant to a valid arrest warrant stemming from the items found in the car.

On November 10, 2015, a grand jury indicted appellant on multiple charges arising out of the evidence obtained from the rental car and subsequent search of

appellant's home pursuant to a search warrant.[4] On June 12, 2016, appellant filed a motion to suppress the evidence recovered from the Mustang. Judge Neal E. Kravitz held a three-day evidentiary hearing and denied appellant's motion on June 21, 2016. The motions judge found "no evidence that the police were involved in the search of the car, either conducting it themselves or arranging for or encouraging [] Ross to conduct it on their behalf or with their cooperation." With respect to appellant's detention at the gas station, the judge noted that he "[did not] think that there is any doubt that [] there was a stop of [appellant] and the driver," but made no finding on that issue. He further noted that even if the police lacked a Fourth Amendment justification for the detention, he "[did not] think that any of this affect[ed] the search of the rental car," but that rather affected the "admissibility of the statements" made by appellant during the detention.[5]

---

[4] Appellant was charged with (1) unlawful possession of a firearm, committed with a prior felony conviction involving a crime of violence, D.C. Code § 22-4503(a)(1), (b)(1) (2012 Repl. & 2020 Supp.); (2) unlawful possession with intent to distribute a controlled substance, heroin, D.C. Code § 48-904.01(a)(1) (2012 Repl. & 2020 Supp.); (3) possession of a firearm during a crime of violence, D.C. Code § 22-4504(b) (2012 Repl. & 2020 Supp.); (4) possession of an unregistered firearm, D.C. Code § 7-2502.01(a) (2018 Repl.); and (5) unlawful possession of ammunition, D.C. Code § 7-2506.01(3) (2018 Repl.).

[5] Appellant made statements both before he was handcuffed and stopped by police and after he was handcuffed. The government did not seek to admit those statements.

Appellant then filed a motion to reconsider the denial of the motion to suppress, which the court granted. The court held a hearing on November 17, 2016, at which appellant testified on his own behalf, and the court again denied appellant's motion to suppress. First, the court found that appellant failed to establish that he had a reasonable expectation of privacy in the interior of the Mustang, concluding that "a person in [appellant's] position acting in an objectively reasonable fashion would have asked questions that would have led him, if answered accurately and honestly, . . . to understand that he was not authorized to be driving that car. And, in fact, that Ms. Hawkins wasn't authorized to be in possession of the car either." Next, the court ruled that, in searching the car, Ross was not acting as an agent of the police. The court credited testimony from Ross and Officer Javelle, which the court observed was corroborated by Officer Quinlan's statements, captured on body-worn camera video, "making it clear to Mr. Ross that . . . [the police] could not be involved in the search." Concluding that there was not "any kind of agency relationship or agreement that Mr. Ross would search the vehicle for the police," the court found that "Mr. Ross was acting pursuant to the rules and regulations . . . of his employment [contract] or his work agreement with the car rental company and not at the behest of or as an agent to the police." The court again denied appellant's motion to suppress evidence. The case proceeded to trial and, on December 14, 2017, a jury convicted appellant on all five counts. This appeal followed.

## II.    Standard of Review

Our review of a denial of a motion to suppress is "limited." *Davis v. United States*, 110 A.3d 590, 594 (D.C. 2015).  We view the evidence "in the light most favorable to the prevailing party," and "draw all reasonable inferences in favor of sustaining the trial court's ruling." *Id*.  We defer to the trial court's factual findings and review them for clear error, *Shelton v. United States*, 929 A.2d 420, 423 (D.C. 2007), but review the trial court's legal conclusions de novo, *Davis*, 110 A.3d at 594.

## III.    Legal Framework

The Fourth Amendment's prohibition on unreasonable searches and seizures applies "only [to] governmental action." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *Limpuangthip v. United States*, 932 A.2d 1137, 1142 (D.C. 2007); *United States v. Lima*, 424 A.2d 113, 117 (D.C. 1980) (en banc).  Thus "a wrongful search or seizure conducted by a private party does not violate the Fourth Amendment and . . . such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully." *Walter v. United States*, 447 U.S. 649, 656 (1980).  A private party, however, when acting as an "instrument or

agent of the state," implicates the Fourth Amendment. *Lima*, 424 A.2d at 117 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971) (internal quotation marks omitted)). Determining whether a private act constitutes state action is a "necessarily fact-bound inquiry." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982). Evidence obtained in violation of the Fourth Amendment is inadmissible when obtained as a result of a search conducted in violation of the Fourth Amendment, *see Limpuangthip*, 932 A.2d at 1142, absent an applicable exception. *See, e.g.*, *West v. United States*, 100 A.3d 1076, 1083-84 (D.C. 2014) (discussing "plain view" and "automobile" exceptions to the Fourth Amendment warrant requirement).

### A.     State Action

In deciding whether a private search triggers the Fourth Amendment, we must determine "whether there was sufficient 'governmental involvement' in the search." *Limpuangthip*, 932 A.2d at 1142 (quoting *Alston v. United States*, 518 A.2d 439, 441 (D.C. 1986)). "A private individual may become an agent or instrumentality of the state if the government is involved in the development of a plan which is later carried out by [that] private person[], or stands by while a private citizen seizes the desired evidence." *Lima*, 424 A.2d at 117 (internal citations omitted). Thus, a private

individual's conduct may transform into state conduct when the individual acts "at the direction of the police, in concert with them, or under color of their authority." (*Roosevelt*) *Wright v. United States*, 224 A.2d 475, 477 n.2 (D.C. 1966).

We have long recognized that the conduct of a private actor may amount to state action if the government is "involved in" the private actor's plan, *Lima*, 424 A.2d at 117, effectively analyzing the quantum of the state's participation in the search. The "decisive factor" of such involvement is "the actuality of a share by [the government] in the total enterprise of securing and selecting evidence by other than sanctioned means." (*Roosevelt*) *Wright*, 224 A.2d at 476–77 (quoting *Lustig v. United States*, 338 U.S. 74, 79 (1949), *overruled on other grounds by Elkins v. United States*, 364 U.S. 206 (1960)). Regardless of whether a state actor "originated the idea or joined in it while the search was in progress[, s]o long as he was in it before the object of the search was completely accomplished, he must be deemed to have participated in it." *Id*. We analyze a state actor's "participation . . . to determine whether there was such involvement on [his or her] part . . . that responsibility for the search and seizure must be attributed to the police." *Moody v. United States*, 163 A.2d 337, 340 (D.C. 1960). Evidence of state action can stem from efforts by a government official to "coerce or dominate" the private actor or "direct [the private actor's] actions by the more subtle techniques of suggestion," *Coolidge*, 403 U.S at

489, as well as a government official's "ongoing cooperation" with the private actor, *Lucas v. United States*, 411 A.2d 360, 362-63 (D.C. 1980).

However, in certain circumstances a private search may also be state action if a police officer is present and "stands by while the private party seizes the desired evidence." *Alston*, 518 A.2d at 442 (citing *Moody*, 163 A.2d 337). The only "stands by" decision from this jurisdiction is *Moody*, and our cases recognizing such a threshold for state action all cite to that decision. *See, e.g.*, *id.*; *Lima*, 424 A.2d at 117 (citing *Moody*); *Lucas*, 411 A.2d at 362 (same). In *Moody*, the complainant reported to a police officer that Moody, who lived in the complainant's apartment building, had broken into his apartment and stolen various items from him. 163 A.2d at 338. After detaining Moody and placing him in a police car, the officer accompanied the complainant to Moody's apartment, the door to which was open. *Id.* at 339. The officer waited in the hallway while the complainant entered Moody's apartment, retrieved the allegedly stolen items ("scattered about the floor, plainly visible from the hallway"), and gave them to the officer. *Id.* at 339. The officer did not "induce [the complainant's] actions," however the court could not "characterize him as a willing but innocent beneficiary in standing silently by while the appropriation was taking place." *Id.* at 339-40. In determining that there was state action, the court considered that the officer "recognized the evidentiary value of the

goods," his lack of effort to deter the complainant from entering the apartment, and the "legality of the means by which the stolen articles came into the possession of the police." *Id.* In those circumstances, the officer, by "standing silently by while the appropriation was taking place," tacitly approved the unauthorized search and transformed the complainant from a private citizen to "an arm of the police." *Id.* at 340. *Moody* turned on both the (il)legality of the private actor's search and the tacit approval of, and interest in, the search by the officer "standing silently by." *Id.* at 339-40.

The California Supreme Court, in *Stapleton v. Superior Court of Los Angeles County*, similarly held that the police's knowledge of and failure to prevent an "obviously illegal [private] search" implicated the Fourth Amendment. 447 P.2d 967, 970 (Cal. 1968). As part of a credit-card fraud investigation, local police invited private credit-card agents to assist them in executing an arrest warrant of the petitioner at his home. *Id.* at 968. After the petitioner was arrested, one of the agents, acting on his own initiative, searched the petitioner's car parked down the street and found canisters of tear gas in the trunk. *Id.* The police seized the canisters, and a trial court admitted the canisters as evidence in the criminal case against the petitioner. On appeal, the California Supreme Court likened the case to *Moody* and observed that the police "put [the credit-card agent] in a position which gave him

access to the car keys and thus to the trunk of petitioner's car" and "stood silently by" while the credit-card agent conducted the "obviously illegal" search of the trunk, "which probably constituted both a misdemeanor and a trespass to petitioner's personal property." *Id.* 970–71. The court held that the agent's unlawful search implicated the Fourth Amendment because, even though the police did not direct the agent to search the car, their "knowledge of the illegal search coupled with a failure to protect the petitioner's rights against such a search," transformed the private search into a government one. *Id.*

Illustrated in *Moody* and *Stapleton* is recognition that in order to impute state action to a private search, based solely on a failure of the police to discourage or prevent that search, the search must have been wrongful. *See, e.g.*, *United States v. Mekjian*, 505 F.2d 1320, 1328 (5th Cir. 1975) (noting that, absent government encouragement or cooperation, state-action inquiry turns on "government knowledge that an *illegal* search was being conducted and that the government would be the beneficiary of such misconduct" (emphasis added)); *Commonwealth v. Borecky*, 419 A.2d 753, 756–57 (Pa. Super. Ct. 1980) ("[N]otwithstanding the lower court's finding that the police neither initiated the search nor instructed the informant to conduct a search, the state trooper's admitted prior knowledge of the warrantless search, and acquiescence therein, was sufficient to constitute ratification of the

informant's *illegal* activity on behalf of the Commonwealth." (emphasis added)); *cf.* 1 Wayne R. LaFave, *Search and Seizure* § 1.8(b) (5th Ed. 2012) ("[T]he police need not attempt to prevent a search the private party may lawfully make merely because such a search could not be undertaken by the officer himself.").

Indeed, courts have generally declined to find state action where a private party conducted a search that was lawful or where the private party's authority was at least ambiguous, and where the police were merely present but otherwise uninvolved. *See United States v. Dahlstrom*, 180 F.3d 677 (5th Cir. 1999) (concluding that company officials who searched a company office and seized company property, in the presence of police, were not state agents); *United States v. Smythe*, 84 F.3d 1240, 1243 (10th Cir. 1996) (holding that bus-station manager's "legitimate" search of a suspicious package in the presence of police was not state action, noting that "[w]hile government agents may not circumvent the Fourth Amendment by acting through private citizens, they need not discourage private citizens from doing that which is not unlawful"); *In Interest of J.A.*, 186 A.3d 266, 277 (N.J. 2018) (finding no state action where defendant's brother "decided to search [their shared] house without solicitation or even encouragement from the officers present").

Although our court has yet to address state action in the context of a repossession, other courts have declined to find state action in repossession cases involving police officers who merely "stand by." *See, e.g.*, *United States v. Coleman*, 628 F.2d 961, 964 (6th Cir. 1980) ("[M]ere acquiescence by the police to 'stand by in case of trouble' was insufficient to convert the repossession of the truck into state action."); *Wright v. Nat'l Bank of Stamford*, 600 F. Supp. 1289, 1295 (N.D.N.Y. 1985) ("What is significant about this scenario, and what is uncontradicted by any evidence, is the total lack of involvement by the deputy sheriffs. Other than their mere presence, they had absolutely no involvement in the repossession."), *aff'd*, 767 F.2d 909 (2d Cir. 1985); *State v. Lee*, 628 A.2d 1318, 1323 (Conn. App. Ct. 1993) (finding no state action where repossession agent inventoried contents of appellant's car in presence of police officer, who "did not participate or assist him in any way"). In the spectrum of police involvement at the scene of a private repossession, standby services to preserve the peace is *de minimis* police involvement that falls short of state action. *See Barrett v. Harwood*, 189 F.3d 297, 302 (2d. Cir. 1999) (describing spectrum of police involvement in private repossessions). On the other hand, police involvement that "chills the [appellant's] right to object" to the repossession, "particularly when it is accompanied by physical obstruction," is sufficient to transform the repossession into state action. *Hensley v. Gassman*, 693 F.3d 681, 689 (6th Cir. 2012) (discussing cases).

We find these repossession cases particularly instructive as they illustrate the harmony between our holding in *Moody* and the principle that a repossession is not state action where police play no part in the repossession and instead merely "stand by" in the performance of their "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Coleman*, 628 F.2d at 965 (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). Private repossessions, unlike the searches in *Moody* and *Stapleton*, are not "obviously illegal" private acts during which the police must avoid "standing silently by" to avoid implicating the Fourth Amendment. Further, the police should not be discouraged from responding to a citizen's call for assistance out of a fear of placing the government's imprimatur of approval on a private repossession.

### B. Reasonable Expectation of Privacy

The Fourth Amendment to the United States Constitution protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. U.S. Const. amend. IV. With respect to searches, "applicability of the Fourth Amendment depends on whether the person

invoking its protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (cleaned up) (citing *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978)). Such inquiry requires examination of a person's "actual (subjective) expectation of privacy," *Katz v. United States*, 389 U.S. 347, 351 (1967) (Harlan, J. concurring), which in turn "society is prepared to recognize as 'reasonable,'" rendering it a legitimate claim of privacy to be protected from governmental intrusion. *Id.* at 361; *see also Rakas*, 439 U.S. at 143 n.12.

In determining if an asserted privacy expectation is legitimate, we consider the totality of the circumstances, such as the "nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations." *United States v. Jackson*, 214 A.3d 464, 472 (D.C. 2019) (quoting *Grady v. North Carolina*, 575 U.S. 306, 310 (2015)), *Mills v. United States*, 708 A.2d 1003, 1007 (D.C. 1997), *see United States v. Smith*, 263 F.3d 571, 586 (6th Cir. 2001) (citing *Rakas*, 439 U.S. at 152) ("given that we must determine whether [appellant] had a legitimate expectation of privacy which was reasonable in light of all the surrounding circumstances."); *see also Rakas*, 439 U.S. at 152 ("In considering the reasonableness of asserted privacy expectations the [Supreme] Court has recognized that no single factor invariably will be determinative.") (Powell, J., concurring); *see*

*id.* at 145 n.13 (employing "a bright line test" in cases involving reasonable expectations of privacy is disfavored as it "has led to widely varying results") (internal citations and quotation marks omitted).

Within the context of assessing privacy expectations in rental vehicles, the Supreme Court recently held that an unauthorized driver in lawful possession and control of a rental vehicle retains a reasonable expectation of privacy in the vehicle that comes with the right to exclude. *Byrd v. United States*, 138 S. Ct. 1518, 1528, 1531 (2018). However, *Byrd* does not address whether an unauthorized driver retains a legitimate expectation of privacy in a rental vehicle after possessory interest and control of the rental vehicle is terminated. This is a matter of first impression for this court.

In cases involving termination or repossession of rental property, such as vehicles or rooms, other jurisdictions have determined that when the owner of the rental property terminates a renter's possessory interest, the renter can no longer assert a legitimate expectation of privacy in the property. *See People v. Merchant*, 272 N.W.2d 656, 658 (Mich. Ct. App. 1978) (holding that the defendant no longer has an expectation of privacy in the rental vehicle after the rental agreement was terminated); *United States v. Allen*, 106 F.3d 695, 699 (6th Cir. 1997) (concluding

defendant can no longer assert a legitimate privacy interest in the motel room after the manager effectively took possession by locking him out). It follows that when a renter can no longer claim a lawful possessory interest or control in rental property, due to termination or repossession, any reasonable expectation of privacy in the premises ceases. *See Byrd*, 138 S. Ct. at 1528 ("[O]ne who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude") (cleaned up) (quoting *Rakas*, 439 U.S. at 144, n.12); *see also United States v. Cormier*, 220 F.3d 1103, 1108 (9th Cir. 2000) ("[A] person does not possess a reasonable expectation of privacy in an item in which he has no possessory or ownership interest." (citing and discussing *United States v. (Mitchell) Miller*, 425 U.S. 435, 440 (1976))).

The matter before us goes one step further requiring a determination as to whether a person retains a legitimate expectation of privacy in bags containing personal effects stored within the trunk of a rental car at the time of repossession. Some jurisdictions have determined that after a renter's possessory interest and control over a rental space has been terminated the renter no longer maintains a reasonable expectation of privacy in any personal belongings left inside. *See Merchant*, 272 N.W.2d at 658 (determining that the defendant lacked standing to contest the removal of his personal property from the rental vehicle after the rental

agreement was terminated); *Allen*, 106 F.3d at 699 (6th Cir. 1997) (holding defendant could no longer assert a legitimate privacy interest in the contents of his motel room after the manger took possession of the room by locking him out). Implicit in the conclusions of *Merchant* and *Allen* is the rationale that a renter can no longer assert a legitimate expectation of privacy because their control over the personal property has been severed. However, the conclusion that privacy is severed because control cannot be exercised ignores any ownership or possessory interest that can be asserted.

In at least one jurisdiction, a renter maintains a reasonable expectation of privacy in personal belongings left inside of rental space – even after the renter's possessory interest and control in the rental space has been terminated – because their ownership and possessory interest remains intact. *People v. Sotelo*, 336 P.3d 188, 194 (Colo. 2014) (en banc). The Supreme Court of Colorado, in *People v. Sotelo*, as a matter of first impression determined, pre-*Byrd*, that an unauthorized driver of a rental car has a legitimate expectation of privacy in gift-wrapped packages within the car. *Id.* Defendants driving a rental car, though neither was listed as an authorized driver, were stopped by a state trooper for driving too slowly in the left-hand lane. *Id.* at 190. The car was towed and items within the car were inventoried, including three gift-wrapped packages. *Id.* The defendants were asked to consent

to a search of the gift-wrapped packages, but they refused. *Id.* A K-9 police dog conducted a "free air search" around the car and alerted to the trunk. *Id.* at 190-91. Troopers obtained a warrant and unwrapped the three gift-wrapped packages to reveal fifty-seven pounds of marijuana, which was admitted as evidence against the defendants at trial. *Id.* at 191.

On appeal, the Colorado Supreme Court did not address whether the defendants had standing to challenge the search with respect to the rental vehicle, but only addressed "whether an unauthorized driver of a rental car may have standing to challenge a search of packages within the rental car, regardless of whether the driver has standing to challenge the search of the rental car itself." *Id.* at 192. The court held that an unauthorized driver of a rental car satisfies both prongs of the reasonable expectation test to challenge a Fourth Amendment search of his or her possessions within a rental car. *Id.* at 194. The determination was based upon the principles that "a person with a possessory or proprietary interest in the property *or* premises searched, can assert the right to be free from unlawful searches and seizures," *Id*. at 194 (cleaned up) (quoting *Perez v. People*, 231 P.3d 957, 960 (Colo. 2010)), and that "the owner or possessor of a sealed container possesses a legitimate expectation of privacy in its contents." *Id*. at 195 (citing *People v. Hillman*, 834 P.2d 1271, 1275 n.12 (Colo. 1992)).

*Sotelo* establishes that even in the absence of control, a person with ownership and possessory interest preserves a legitimate expectation of privacy in the contents of encased property. We reached a similar conclusion in addressing whether an individual retained a reasonable expectation of privacy in a briefcase after he was no longer in control of it. *In re B.K.C*, 413 A.2d 894 (D.C. 1980).[6] Appellant, B.K.C., was convicted of petit larceny when a stolen department store shirt obtained pursuant to a warrantless search of his briefcase was presented as evidence at trial. *Id.* at 896. At the time the briefcase was seized B.K.C. had relinquished possession of it to D.A.V., who accompanied him at the department store. *Id.* at 896. In assessing whether B.K.C. maintained a reasonable expectation of privacy in the contents of briefcase after handing it off to D.A.V., we determined that in spite of relinquishing control of the briefcase, B.K.C retained a legitimate expectation of privacy that even in the hands of another it "would be free from government intrusion." *Id.* at 901. We preserve our position, as expressed in *In re B.K.C*, that even in the absence of control,

---

[6] *In re B.K.C.*, receives negative treatment in *Sheffield v. United States*, 111 A.3d 611, 619 (D.C. 2015) for separate reasons than relied upon here. *Sheffield*, in accordance with Supreme Court jurisprudence, establishes that an individual no longer needs to demonstrate a reasonable expectation of privacy in unlawfully seized property because seizure "would obviously invade the owner's possessory interest." *Id.* (quoting *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 65-66 (1992)).

a property owner maintains a legitimate expectation of privacy in the contents of encased property.

Also of import in evaluating the circumstances surrounding privacy expectations is the nature of the item and the individual's use of the item. *Id.* at 901. It has long been recognized that containers used as "a common repository for one's personal effects" are inevitably associated with an expectation of privacy. *Id.* (quoting *Arkansas v. Sanders*, 442 U.S. 753, 762 (1979)). Persons with a possessory interest in luggage, briefcases, and travel bags generally have a reasonable expectation of privacy in those items. *Bond v. United States,* 529 U.S. 334, 336-37 (2000) (holding that a bus passenger who places his luggage in an overhead bin retains an expectation of privacy); *see United States v. Buchner*, 7 F.3d 1149, 1154 (1993) (determining that a defendant in his girlfriend's rental car had a legitimate expectation of privacy with respect to the contents of a shoulder bag that he owned); *United States v. Kelley*, 981 F.2d 1464, 1467 n.1 (5th Cir. 1993), *cert. denied*, 508 U.S. 944 (finding that the owner of suitcase located in another car has a legitimate expectation of privacy in its contents). However, "[w]hat one may put in a suitcase, another may put into a paper bag." *Robbins v. California*, 453 U.S. 420, 427 (1981). With respect to items in a container that is neither closed nor sealed, a reasonable expectation of privacy may still attach so long as the container does not "clearly

announce[] its contents, whether by its distinctive configuration, its transparency, or otherwise, that its contents are obvious to an observer." *United States v. Prandy-Binett*, 995 F.2d 1069, 1078 (D.C. Cir. 1993) (quoting *Robbins*, 453 U.S. at 427) (holding that a brick-shaped package wrapped in duct tape does not clearly broadcast its contents).

We hold that a person retains a reasonable privacy expectation in the contents of encased personal property left within a repossessed rental vehicle, where said individual owns or asserts a possessory interest in the property.[7]

**C. Consent**

We have observed that a warrantless search is valid if it is based on "a police officer's reasonable belief that the person consenting to the search had the authority to do so." *Ashby v. United States*, 199 A.3d 634, 649 (D.C. 2019) (quoting *(Cleveland) Wright v. United States*, 717 A.2d 304, 307 (D.C. 1998)); *see also*

---

[7] We acknowledge the government's argument that appellant may not have been able to claim a legitimate expectation of privacy in the rental vehicle after their possessory interest was terminated or the vehicle repossessed but need not reach a conclusion on the issue because appellant retained a reasonable privacy expectation in the contents of his claimed personal property left within a repossessed rental vehicle.

*Illinois v. Rodriguez*, 497 U.S. 177 (1990) (holding that a search based on third-party consent is valid if an officer reasonably believes that the third party has such authority, even if the person does not have such authority). Our "determination of consent to [search] must be judged against an objective standard." *Rodriguez*, 497 U.S. at 188. Thus, a warrantless search is valid if the police reasonably believe a third party has actual or apparent authority to consent to the search. *See Ashby*, 199 A.3d at 649. This is an inherently factual inquiry. *See Welch v. United States*, 466 A.2d 829, 844-45 (D.C. 1983). This analysis does not turn on whether or not a party had authority to grant such consent, but whether "the facts available to the officer at the moment warrant a [person] of reasonable caution in the belief that the consenting party had authority over the premises." *Rodriguez*, 497 U.S. at 188 (cleaned up).

## IV. Discussion

Viewing the evidence in the light most favorable to the government, *see Armstrong v. United States*, 164 A.3d 102, 107 (D.C. 2017), we hold that Ross's search of the Mustang was subject to the strictures of the Fourth Amendment. Ross's conduct falls within the category of searches precluded by *Moody*, whereby police officers tacitly approve an unauthorized private search. Ross lacked appellant's consent to search the bags that appellant claimed ownership of inside the trunk of

the car and MPD officers knew that appellant claimed ownership of those bags. We also hold that appellant retained a legitimate expectation of privacy in the contents of his bags in the trunk. Thus, the evidence obtained as a result of Ross's search of the appellant's bags in the trunk of the repossessed rental car is inadmissible, absent an exception.

We review the facts available to the police officers to determine whether it was reasonable for them to believe that Ross had authority to consent to a search of the appellant's bags. *See Rodriguez*, 497 U.S. at 188. We conclude that it was not. Appellant consistently and continually asserted ownership over the items in the bags in the trunk of the car, and both Ross and MPD knew that appellant claimed such ownership. In fact, the sole purpose of Ross's intent in conducting a search of the car was to ensure that he had an inventory of appellant's property. While the MPD officers standing by knew that Enterprise, by way of Ross, repossessed and had exclusive control of the vehicle, there is no evidence of the officers' knowledge concerning the scope of Ross's authority to search the car, and specifically the bags within it. Ross was not the owner of the car, which the police officers knew, and his authority to search it turned on the consent given to him by its owner, Enterprise. While the motions judge found that Ross "was acting pursuant to the rules and regulations of his . . . employment contract[] or his work agreement with

[Enterprise]," there is no evidence in the record concerning the extent of those rules and regulations, that the MPD officers had any knowledge about such scope, or that such authority extended to Ross's ability to search or consent to a search of appellant's personal items within the car.[8]  Therefore, it was not objectively reasonable for the police to believe that Enterprise authorized Ross to "look through all of [appellant's] belongings" left in the repossessed rental car given the knowledge by all persons that appellant claimed ownership of those items.  Thus, we are presented with an unlawful or invasive private search, akin to *Moody*, 163 A.2d at 340.

At some point, as the police participate in or encourage an inventory after repossession, the once private action assumes the character of state action.  The decisive factor which converts private action into state action is when the government has a "hand in" or "share in . . . the total enterprise." *(Roosevelt) Wright*, 224 A.2d at 476-77 (proclaiming origination of the idea of joining in while in

---

[8]    In assuming, without deciding, Ross was conducting a permissible inventory of the Mustang's contents, the evidence in the record does not demonstrate that Ross was conducting a thorough inventory.  Ross testified that in conducting his inventory he "just looked on top of [the bags] and [] sat them on the ground just making sure that there was nothing. . . that was harmful to me or anyone else."  Ross further testified that the inventory is conducted to cover himself, and that in doing so he makes sure he has a "general idea of what is in the vehicle" when he drops it off at the rental company's holding facility in Virginia.

progress evinces government participation as having a hand in or share in the total enterprise).  Here, the MPD officers' participation in Ross's search of the Mustang was sufficient to amount to the government having a share in the search as demonstrated by their tacit approval of Ross's unlawful search of appellant's bags and interest in the fruits of the search.

While MPD officers were investigating appellant at the gas station, thus keeping him from overseeing Ross's search of his bags, Ross requested that other MPD officers accompany him to the Mustang.[9]  The officers knew that appellant claimed an ownership interest in the items in the car.  By separating appellant from the Mustang during Ross's search, the police, in a sense, helped to "facilitate [the] repossession" by "chill[ing] [appellant's] right to object."  *Hensley*, 693 F.3d at 689 -90 (explaining that police officers facilitate a repossession "through active intervention and assistance" by "joining forces" with the repossession person by ignoring protests or threatening arrest; or by inactive participation by being closely associated with the repossession such that the debtor is of the belief that the weight of the state is behind the repossession to deter objection).

_____

[9]  We note concern as to the legality of MPD's detention of appellant at the gas station.  Because the government lacked consent and probable cause to search the bags in the Mustang, however, we decline to address appellant's argument that the items recovered in the Mustang were fruits of, what he alleges, an unconstitutional detention at the gas station.

Moreover, the officers' knowledge of Ross's illegal search, coupled with their interest in and expectation of benefit from it, have transformed Ross's conduct into state action. *Moody*, 163 A.2d at 339-40 (concluding there was state action even if the officer did not induce complainant because the officer benefitted from the complainant's illegal search of Moody's apartment while Moody was detained in the police vehicle). While the officers did not dig through appellant's bags themselves, they told Ross "that [he] could search the car and if [he] found anything to just let them know." In *Moody*, the court, in determining that the private actor's conduct was state action, noted that the police officer "recognized the evidentiary value of the goods," and could not characterize him as a "willing but innocent beneficiary" of the private actor's search. 163 A.2d at 339-40. Those same circumstances are present here. The officers permitted Ross to search the bags although they knew the bags belonged to appellant and they lacked any knowledge that appellant consented to his bags being searched. The officers were also interested in the fruits of the search as evidenced by their close proximity, behind the Mustang, while Ross searched. As such, the MPD officers "standing silently by" while Ross conducted a search of appellant's bags, tacitly approved an unauthorized search having a hand in the total enterprise, (*Roosevelt*) *Wright*, 224 A.2d at 476-77, and transformed Ross into "an arm of the police." *Moody*, 163 A.2d at 340.

Concluding that Ross's search amounts to state action, we must next examine whether appellant may invoke the protections of the Fourth Amendment and " claim a legitimate expectation of privacy [in his bags left within the truck of the repossessed Mustang] that has been invaded by government action." *Smith*, *supra*, 442 U.S. at 740. We conclude that appellant retained a legitimate expectation of privacy in his bags that were stored in the trunk of the Mustang at the time it was repossessed. Assuming without deciding that appellant may not have had a possessory interest in the Mustang, appellant retained a possessory interest in his personal effects contained inside a bag in the trunk of the vehicle, such that appellant retained the right to exclude search of the bags. *See Byrd*, 138 S. Ct. at 1528 ("one who owns . . . property will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude"); *see also Sotelo*, 336 P.3d at 194 (holding that even after a rental car was taken into the possession of police, the appellant retained a legitimate expectation of privacy in the contents of gift-wrapped boxes in the vehicle). The mere fact that appellant no longer had control over his bags does not negate his ownership or possessory interest in the bags. *See In re B.K.C.*, 413 A.2d at 901 (holding that appellant retained reasonable expectation of privacy in briefcase, even though he was no longer in control of it). Based on appellant's attempt to retrieve his bags and verbal requests to remove his bags, Ross and the MPD officers

knew that appellant claimed ownership over the bags. Moreover, the contents of the bags were not plainly identifiable by Ross or the MPD officers. Though the record does not specify if all of the bags searched were black and plastic, at a minimum the bag containing the firearm was, suggesting that the contents of this bag could not be identified because the bag was not transparent. In order to identify the contents of the bags, Ross had to pick them up and peer into their tops. Based upon all circumstances surrounding the search of appellant's bags, i.e., his explicit claim of ownership and the physical nature of the bags, appellant retained a legitimate expectation of privacy in the bags.

The government does not argue any exception to the warrant requirement that justified Ross's initial search of the bags in the trunk of the Mustang.[10] Rather, its

---

[10] The trial court's conclusion that Ross had the authority to search the vehicle and bags for inventory purposes turned on the determination that there was no state action. Now that governmental action has been established, we find it necessary to more closely scrutinize Ross's stated reasons for conducting an inventory. *In re B.K.C.*, 413 A.2d at 905 ("If the record reveals that the search is an attempt to merely explore the property for evidence, then it cannot be justified as an inventory search."). In addition to testifying that he was inventorying to cover himself and the rental company, and to make sure there was nothing in the bags that would harm him or anyone else, Ross also testified that he was conducting an inventory in case there was something in the car the MPD might need to recover. This was within the context of his suspicion that something would be found linking the car to an "auto theft" or "fraud" ring. Although neither party suggests the inventory exception applies, on second inspection, the record reveals the search may have been an

focus is on Ross's discovery of the gun, which it argues gave the police probable cause to search the trunk and the contents of the bags in the trunk.[11]  We conclude that there was no probable cause for Ross to search the bags.  The MPD acknowledged as much, in that Officer Quinlan, upon Ross's request to search the car, was "very adamant . . . that MPD was not going to search the car, that [MPD] did not have a search warrant, that the car was not reported stolen, and that [Officer Quinlan] wasn't going to get involved in looking through the car."  Because we conclude that no exception to the Fourth Amendment's warrant requirement was present, the evidence obtained as a result of Ross's search of the bag was inadmissible, and the trial court erred in denying appellant's motion to suppress.[12]

---

attempt to sift through appellant's bags for evidence rather than conducting an inventory for commercial liability purposes.

[11]  The government argues that police observation of a gun "in plain view" in a vehicle may provide sufficient probable cause for a search.  *See, e.g.*, *Zanders v. United States*, 75 A.3d 244, 248 (D.C. 2013) (finding probable cause when an officer observed in plain view an "ammunition clip of a gun protruding from under the front passenger seat" of a car).  However, such observation must first square with the plain view exception, which only allows for the warrantless seizure of evidence "in plain sight" when: "(1) an officer [did] not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed; (2) the evidence's incriminating character is immediately apparent; and (3) the officer has a lawful right of access to the object itself."  *Porter v. United States*, 37 A.3d 251, 256 (D.C. 2012) (quoting *Umanzor v. United States*, 803 A.2d 983, 998-99 (D.C. 2002)).

[12]  The "automobile exception to the Fourth Amendment warrant requirement" authorizes police to search a vehicle without a warrant if they "have probable cause

## V.    Conclusion

We hold that Ross's search of appellant's bags in the trunk of the Mustang implicated the Fourth Amendment.  MPD officers stood by during Ross's search of the appellant's bags which they reasonably knew or should have known was unauthorized.  Private action transformed into state action as MPD gave tacit approval of Ross's search of appellant's bags to the extent they detained appellant and showed interest in the fruits of the search, notwithstanding that appellant

---

to believe that the vehicle contains contraband." *West*, 100 A.3d at 1084.  And in certain circumstances, police officers need only reasonable, articulable suspicion to conduct a search of a vehicle, such as incident to an arrest.  *See United States v. Taylor*, 49 A.3d 818, 821-22, 824 (D.C. 2012) (discussing *Arizona v. Gant*, 556 U.S. 332, 342-43 (2009)).  However, in each circumstance, the search is premised on at least a reasonable belief that the vehicle contained such evidence.  In *Taylor*, for example, this court concluded that police lacked "reasonable, articulate suspicion that evidence of the offense of [driving under the influence] would be found in" the vehicle and, thus, were not justified in searching the vehicle for evidence of that crime.  *Id.* at 827-28.  Therefore, evidence of a loaded gun found in a locked glove box was suppressed.  *Id.*  Here, the police did not have any belief that the Mustang contained evidence of a crime, let alone that any such evidence was present in closed bags within the car's locked trunk.

Moreover, while police officers may conduct an inventory search where they have lawful possession of the vehicle – i.e., statutory or regulatory authority for impoundment, probable cause to believe it is a fruit of a crime, or the person consents to such possession or is unable to make other arrangements for its disposition, *see McMillan v. United States*, 527 A.2d 739, 740 (D.C. 1987) – such circumstances are not present here.

retained a legitimate expectation of privacy in the contents of his bags in the trunk. Because there was no probable cause to search the bags, which lead to the discovery of the evidence used against appellant, the trial court erred in denying appellant's motion to suppress. Therefore, the trial court's denial of appellant's motion to suppress must be reversed.

*So ordered.*

MCLEESE, *Associate Judge*, concurring. I concur in the judgment. I agree with the court that Mr. Fogg had a reasonable expectation of privacy in the contents of the bag at issue. First, although the testimony at the suppression hearing was not entirely clear, Mr. Ross testified at trial that he discovered the gun after opening the bag. *See generally, e.g.*, *Dozier v. United States*, 220 A.3d 933, 937 n.1 (D.C. 2019) ("In reviewing the trial court's denial of a motion to suppress, we can consider all testimony from the suppression hearing and undisputed testimony from trial.") (internal quotation marks omitted). I do not understand the United States to dispute in this court that Mr. Ross saw the gun only after opening the bag. Second, I do not understand the United States to dispute in this court that Mr. Fogg asserted a possessory interest in the bag. Opening a bag in such circumstances ordinarily would invade a reasonable expectation of privacy. *See, e.g.*, *McFerguson v. United States*, 770 A.2d 66, 70-71 (D.C. 2001) (defendant had reasonable expectation of privacy in items inside shopping bag that were not exposed to view). Third, I agree with the court that Mr. Fogg's reasonable expectation of privacy in the contents of the bag was not extinguished by the concededly lawful repossession of the car.

I also agree with the court that Mr. Ross's search of the bag was state action. Specifically, Mr. Ross initially refused to permit Mr. Fogg to remove items from the car because Mr. Ross wanted to make sure that the police could search the

car and recover evidence; Mr. Ross advised the police that Mr. Fogg might be involved in fraud; the police (perhaps illegally) seized Mr. Fogg; the police were aware that Mr. Fogg wanted to retrieve items from the car, which their seizure of Mr. Fogg prevented; the police expressly approved the search of the car and asked Mr. Ross to let them know if he found anything of interest; once the police declined to themselves search the car, Mr. Ross searched the car in part because Mr. Fogg had been detained and was at that point unavailable to take possession of items from the car; and Mr. Ross wanted to have the police present while he searched the car. Taken together, these circumstances reflect a level of police involvement in the search that in my view rises to the level of state action.

Given the foregoing, I understand the issue to be whether the Fourth Amendment would have permitted the police to themselves open the bag in the car, not whether it would have been lawful as a matter of civil law for Mr. Ross to have done so as a private person acting solely on behalf of the rental-car agency. Because the trial court denied suppression on other grounds, the trial court did not address the question whether the police lawfully could have themselves opened the bag. It is not entirely clear whether the United States contends that such a police search would have been lawful. The United States arguably suggests in passing that the police could have themselves searched the bag based on consent from

Mr. Ross. The United States does not develop that argument, however, and we ordinarily do not consider arguments that are mentioned but not adequately briefed. *E.g.*, *Matthews v. United States*, 13 A.3d 1181, 1190 n.8 (D.C. 2011). In any event, the United States would bear the burden of proof on the issue of consent. *E.g.*, *Oliver v. United States*, 618 A.2d 705, 709 (D.C. 1993). I am doubtful that the United States has carried the burden of establishing that, in the circumstances of this case, the police themselves could lawfully have relied on consent from Mr. Ross to open bags in the car in order to search for evidence.

For the foregoing reasons, I conclude that the motion to suppress should have been granted. I therefore concur in the judgment of the court.